UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| In re Zillow Group, Inc.<br>Securities Litigation | CASE NO. C17-1387-JCC<br><br>ORDER |

This matter comes before the Court on Defendants' motion to dismiss (Dkt. No. 36) and requests for judicial notice (Dkt. Nos. 38, 43). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the Defendants' motion to dismiss (Dkt. No. 36) and GRANTS in part and DENIES in part Defendants' requests for judicial notice (Dkt. Nos. 38, 43) for the reasons explained herein.

## I.    BACKGROUND

Plaintiffs bring this putative class action against Zillow Group, Inc., ("Zillow") on behalf of purchasers of Zillow securities,[1] alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), Securities and Exchange Commission

---

[1]The alleged class includes all persons, excluding Defendants, who acquired or purchased Zillow securities from November 17, 2014 to August 8, 2017. (Dkt. No. 35 at 2.)

("SEC") Rule 10b–5, and Sections 11 and 15 of the Securities Act of 1933.[2] (Dkt. No. 35 at 2.) Plaintiffs also name as defendants, Spencer Rascoff and Kathleen Phillips, Zillow's Chief Executive Officer and Chief Financial Officer/Chief Legal Officer, respectively (collectively with Zillow "Defendants") (*Id*. at 8.) Plaintiffs have filed a consolidated amended complaint (Dkt. No. 35), which the Court will refer to in this order as the "amended complaint."

Zillow is an online leader in real estate marketing. (*Id*. at 9.) Through its website and online applications, the company provides users with information about homes, real estate listings, and mortgages. (*Id*. at 10.) Zillow's primary source of revenue comes from real estate agents who pay to have their properties listed on Zillow's digital platforms. (*Id*.) Agents pay Zillow based on the amount of "impressions" they receive, which are generated each time a user views an agent's listing. (*Id*.) When users view a listing, they are given the opportunity to send their contact information directly to the agent. (*Id*.) When a user does so, the agent receives what is known as a "lead." (*Id*.)

In 2013, Zillow created an advertising product known as the "co-marketing program." (*Id*.) Essentially, the program allows participating mortgage lenders to pay a percentage of a real estate agent's advertising costs directly to Zillow in exchange for appearing on the agent's listings and receiving some of the agent's leads. (*Id*. at 10–15.) Participating lenders appear on their co-marketing agent's listings as "preferred lenders," with their picture and contact information. (*Id*. at 11.) In addition, when Zillow users choose to provide an agent with their contact information—i.e. generate a lead—the information is automatically sent to the co-marketing lender, unless the user opts out.[3] (*Id*. at 10–11.) Because users are able to opt out of

---

[2] In their response to Defendants' motion to dismiss, Plaintiffs withdrew their claims under the Securities Act, as pled in Counts III and IV of the consolidated amended complaint. (Dkt. No. 39 at 5.) The Court DISMISSES those claims with prejudice. *See* Fed. R. Civ. P. 41(b).

[3] Before Zillow users send their contact information to an agent, they are presented with a box that states either "I would like to receive financing information" or "I want to be pre-approved." (Dkt. No. 35 at 3, 11.) The box is pre-checked, and unless the user unchecks the box, his or her contact information is sent directly to the co-marketing lender. (*Id*.)

sending their contact information, lenders receive, on average, 40% of the leads received by their co-marketing agents. (*Id*. at 15.)

Prior to 2017, an individual lender could pay up to 50% of a co-marketing agent's advertising costs, while up to five lenders could collectively pay 90%.[4] (*Id*. at 15.) When a single lender co-markets with an agent, that lender appears on all of the agent's listings. (*Id*.) However, when multiple lenders co-market with a single agent, each lender is randomly shown on the agent's listings in accordance with the lender's pro-rata contribution of the agent's overall advertising spend. (*Id*.)

On April 1, 2015, Zillow received a subpoena from the Consumer Financial Protection Bureau ("CFPB") requesting information about some of the company's products, including the co-marketing program. (*Id*. at 19.) In February 2017, Zillow received a Notice and Opportunity to Respond and Advise ("NORA") letter from the CFPB, which stated that the agency was considering whether to recommend legal action against Zillow for violation of Section 8 of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* ("RESPA"). (*Id*. at 21.) Zillow responded to the NORA in March 2017, and the following month received another civil investigative demand from the CFPB. (*Id*.)

On May 4, 2017, Zillow revealed in a quarterly filing with the SEC that it had received the NORA and civil investigative demand from the CFPB. (*Id*. at 35.) On a conference call that same day, Phillips informed investors that the CFPB had been investigating the co-marketing program to ensure compliance with RESPA. (*Id*.) Phillips expressed her belief that the co-marketing program allowed agents and lenders to comply with RESPA, and that the program represented a small portion of Zillow's overall revenue. (*Id*.) Shortly thereafter, Rascoff made similar statements during an interview on an Internet television channel. (*Id*. at 32–33.)

On August 8, 2017, Zillow revealed the updated status of the CFPB's investigation in a

---

[4] Zillow changed the program in the beginning of 2017 so that multiple lenders cannot collectively pay more than 50% of an agent's advertising costs. (Dkt. No. 35 at 19.)

filing with the SEC. (*Id*. at 37.) That filing disclosed the following:

> Based on correspondence from the CFPB in August 2017, we understand that it has concluded its investigation. The CFPB has invited us to discuss a possible settlement and indicated that it intends to pursue further action if those discussions do not result in further settlement. We continue to believe that our acts and practices are lawful and that our comarketing program allows lenders and agents to comply with RESPA, and we will vigorously defend against any allegations to the contrary.

(*Id*.) In the two trading days following Zillow's update regarding the CFPB's investigation into the co-marketing program, the company's Class A shares fell 15.7% and its Class C shares fell 15.5%. (*Id*.) Plaintiffs Harris, Offut, and Choy purchased Zillow shares between June 2017 and August 8, 2017. (Dkt. Nos. 16-2, 35 at 7.) Plaintiffs allege that they purchased Zillow shares at an artificially inflated price, and were damaged when Defendants' material misrepresentations regarding the co-marketing program and CFPB investigation were ultimately disclosed in Zillow's August 2017 SEC filing. (Dkt. No. 35 at 7, 38.)

## II. DISCUSSION

### A. Materials Considered

Defendants ask the Court to consider several documents that they assert are either judicially noticeable or that are incorporated by reference in the amended complaint. (Dkt. Nos. 38, 43.) Pursuant to Federal Rule of Evidence 201, a court may take judicial notice of relevant facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b). A district court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c). Facts subject to judicial notice may be considered on a motion to dismiss. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014). District courts may also consider documents incorporated by reference into a complaint. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). A complaint incorporates a document by reference when its claims rely on information contained in the document and the parties do not dispute its authenticity. *Id.*

Defendants ask the Court to consider the following documents: (1) Zillow's Form 10-K

filed February 7, 2014; (2) materials published by the Department of Housing and Urban Development; (3) Zillow's Form 10-K filed February 17, 2015; (4) Zillow's Form 10-Q filed May 4, 2017; (5) Zillow's Form 10-Q filed August 8, 2017; (6) Zillow's Form 10-Q filed November 7, 2017; (7) a certified transcript from a Zillow webinar presented on March 23, 2015; (8) a transcript of a May 4, 2017 earnings conference call; (9) Zillow's Form 4 filed May 9, 2017 concerning Phillips' sale of Zillow stock; (10) Zillow's Schedule 14A Proxy Statement filed April 26, 2017; (11) Zillow's Form 4 filed February 17, 2015 concerning Phillips' sale of Zillow stock; and (13) excerpts from the Merger and Agreements between Zillow, Zebra Holdco, Inc., and Trulia, Inc., from July 28, 2014. (*See generally* Dkt. No. 37.)

Plaintiffs oppose Defendants' request for judicial notice of the transcript of the 2015 webinar because the transcript contains a material error. (Dkt. No. 41 at 1.) The transcript labels as "unintelligible" a word that Plaintiffs believe is clearly intelligible as "RESPA." (*Id.*) The Court has listened to the webinar and concludes that the word marked "[UNINTEL]" on Defendants' transcript is "RESPA."[5] Since the amended complaint makes multiple references to the webinar, the Court will consider it pursuant to the incorporation by reference doctrine.

Defendants separately request that the Court consider a Form 8-K filed by Zillow with the SEC on June 25, 2018. (Dkt. No. 43.) The form, filed after briefing had closed on this motion, states as follows:

> As previously disclosed, the Consumer Financial Protection Bureau ("Bureau") issued Zillow Group, Inc. (the "Company") a Notice and Opportunity to Respond and Advise ("NORA") letter in February 2017. The NORA letter notified the Company that the CFPB's Office of Enforcement was considering whether to recommend that the Bureau take legal action against the Company, alleging that it violated Section 8 of the Real Estate Settlement Procedures Act ("RESPA") and Section 1036 of the Consumer Financial Protection Act ("CFPA"). The Company responded to the NORA letter in March 2017 and thereafter engaged in discussions with the Bureau. On June 22, 2018, the Company received a letter from the Bureau stating that it had completed its investigation, that it did not intend to take

---

[5] Grow Your Business Together with Lender Co-Marketing, YouTube (Mar. 23, 2015), https://www.youtube.com/watch?v=lqk-PmKgcss. Last visited August 5, 2018.

enforcement action, and that the Company was relieved from the document-retention obligations required by the Bureau's investigation.

(*Id.*) The Court has confirmed that this Form 8-K was filed with the SEC.[6] Plaintiffs do not object to the Court taking judicial notice that Zillow filed the Form 8-K; rather, they object to the Court accepting the information in the filing as true for the purposes of deciding Defendants' motion to dismiss. (Dkt. No. 44 at 2.)

While the Court can take judicial notice of the fact that a document was filed with the SEC, and of the contents of such a filing, "[t]he truth of the content, and the inferences properly drawn from them [] is not a proper subject of judicial notice under Rule 201." *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008) (citation omitted). Defendants apparently want the Court to take judicial notice of the fact that the CFPB has concluded its investigation and does not intend to take enforcement action against Zillow. (*See* Dkt. Nos. 43, 45.) The Court will take judicial notice of the fact that Zillow filed the June 2018 Form 8-K, as well as of that document's contents. (*See* Dkt. No. 43 at 6–9.) However, the Court will not accept the contents of the Form 8-K—i.e., the CFPB's representations to Zillow about its future actions—as true for purposes of resolving Defendants' motion to dismiss.[7]

For the above reasons, Defendants' requests for judicial notice (Dkt. Nos. 38 and 43) are GRANTED in part and DENIED in part.

### B.    Legal Standard for Motion to Dismiss Securities Fraud Claim

To state a claim for securities fraud under Section 10(b) and Rule 10b–5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

---

[6] Zillow Grp., Inc., Current Report (Form 8-K) (June 22, 2018). https://www.sec.gov/Archives/edgar/data/1617640/000161764018000010/otherevents.htm. Last visited September 8, 2018.

[7] If the Court were to accept Defendants' offer to file the CFPB's letter to Zillow regarding the information disclosed in the June 2018 Form 8-K, the Court would have to convert Defendants' motion to dismiss into a motion for summary judgment. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("[I]f a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond.").

connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2407 (2014)).

Normally, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). Complaints alleging securities fraud claims under Section 10(b) and Rule 10b–5 must additionally satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1047 (9th Cir. 2011) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)). Rule 9(b) requires that claims alleging fraud or mistake must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Pursuant to the PSLRA, a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit has described the PSLRA's pleading standard as follows:

> Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry. In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether "particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors." Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a "strong inference" that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is

properly dismissed under Rule 12(b)(6).

*Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (citation omitted). While the Court must accept as true all well-pleaded allegations in the complaint, it is not required to accept allegations that are contradicted by extrinsic materials that are properly considered on a motion to dismiss. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

### C. Plaintiffs' Securities Fraud Claims

Defendants argue that Plaintiffs fail to sufficiently allege the elements of material misleading statements, scienter, and loss causation. (Dkt. No. 36 at 8.) There are essentially two parts to Plaintiffs' securities fraud claims. First, Plaintiffs allege that Zillow not only designed the co-marketing program to allow agents and lenders to violate RESPA, but that the company also encouraged and facilitated such violations. (*See* Dkt. Nos. 35 at 22, 39 at 5–6.) Having asserted that the co-marketing program, and by extension Zillow, violated RESPA, Plaintiffs allege that Defendants made various statements regarding Zillow's legal compliance and the CFPB's investigation into the co-marketing program that were false and misleading. (*Id.*) Before the Court can analyze the statements that Plaintiffs allege were false and misleading, it must first assess Plaintiffs' allegations regarding Zillow's RESPA violations. If Plaintiffs have not provided particularized facts to support their claims regarding these alleged violations, then many of Defendants' statements could not have been false or misleading. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); 15 U.S.C. § 78u-4(b)(1) (Plaintiffs must allege with specificity "the reason or reasons why the statement is misleading."). After analyzing these issues, the Court will evaluate Plaintiffs' allegations regarding scienter and loss causation.

#### 1. RESPA Allegations

Passed by Congress in 1974, RESPA broadly regulates various aspects of real estate transactions. 12 U.S.C. § 2601 *et seq.* One of the law's stated purposes is "the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement

services." 12 U.S.C. § 2601(b)(2). To achieve that goal, RESPA's Section 8(a) prohibits giving or accepting "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).

"Courts commonly find a violation of § 2607(a) when (1) a payment or thing of value was exchanged, (2) pursuant to an agreement to refer settlement business, and (3) there was an actual referral." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015). "Thing of value" includes "any payment" or "consideration." 12 U.S.C. § 2602(2). "An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct." 12 C.F.R. § 1024.14(e). A referral includes "any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service" such as a mortgage lender. 12 C.F.R. § 1024.14(f)(1).

Notwithstanding the law's prohibition on paying for referrals, RESPA's Section 8(c) contains a safe harbor provision that permits "[a] payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c); 12 C.F.R. § 1024.14(g)(iv). The Ninth Circuit has interpreted the safe harbor to apply (1) where "goods or facilities were actually furnished or services were actually performed for the compensation paid" and, (2) "the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed." *Geraci v. Homestreet Bank*, 347 F.3d 749, 751 (9th Cir. 2003).

Plaintiffs allege that Zillow, through its design and operation of the co-marketing program, facilitated RESPA violations in two overarching ways. First, Plaintiffs allege that the co-marketing program acted as a vehicle to allow real estate agents to make illegal referrals to lenders in exchange for the lenders paying a portion of the agents' advertising costs to Zillow. (Dkt. No. 35 at 24.) In addition to illegally paying for referrals, Plaintiffs allege that the co-

marketing program facilitated RESPA violations by allowing lenders to pay a portion of their agents' advertising costs that was in excess of the fair market value for the advertising services they actually received. (*Id.*) As the Court explains below, Plaintiffs have failed to sufficiently plead either theory of RESPA liability.

Plaintiffs allege that Defendants created the co-marketing program to allow real estate agents to steer prospective home buyers to mortgage lenders, in exchange for the lenders paying a portion of the agent's advertising costs to Zillow. (*Id.* at 16.) According to Plaintiffs, referrals occur when lenders receive leads from Zillow and thereafter work with their co-marketing agent to secure the business of the prospective homebuyer.[8] (*Id.* at 12; Dkt. No. 39 at 11–12.) ("Though Rascoff has analogized Zillow's co-marketing program with earlier print co-marketing programs, this comparison elides an important difference—Zillow directly provides leads to both lenders and advertisers.") Plaintiffs allege that when lenders pay a portion of the agent's advertising costs to Zillow, they are effectively paying to receive unlawful mortgage referrals. (Dkt. No. 35 at 16.)

Plaintiffs support this theory of RESPA liability by citing previous enforcement actions taken by the CFPB. Plaintiffs point to a case from 2015, in which the CFPB levied a $109 million disgorgement order against a mortgage lender that it alleged referred customers to mortgage insurers in exchange for illegal payments. (*Id.* at 18.) That case involved a so-called "tying arrangement," wherein a mortgage lender refers its clients to certain mortgage insurance companies, who in turn would purchase reinsurance from the referring lender's subsidiary. *See*

---

[8] Defendants argue that Plaintiffs cannot prove any RESPA violations because they do not allege that Zillow directly provided referrals to lenders. (Dkt. No. 36 at 14–15) ("Zillow does not refer consumers to lenders under the co-marketing program, but rather acts as an online "billboard" providing consumers to lenders under the co-marketing program."). Defendants relatedly argue that Zillow cannot be held liable for encouraging and facilitating RESPA violations because that statute does not provide for aiding and abetting liability. (*Id.* at 16) (citing *Minter v. Wells Fargo Bank, N.A.*, 924 F. Supp. 2d 627, 646 (D. Md. 2013). The Court need not reach these arguments because Plaintiffs have failed to sufficiently allege any RESPA violations, whether by Zillow or third party agents and lenders participating in the co-marketing program.

*PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 40 (D.C. Cir. 2016). The CFPB alleged that the tying arrangement violated RESPA because the lender was referring homebuyers to the mortgage insurers in exchange for its reinsurance subsidiary receiving business. *Id*. In this case, Plaintiffs allege Zillow's co-marketing program creates an analogous type of pay-for-referral arrangement. (Dkt. No. 39 at 11.)

As Defendants note, however, the D.C. Circuit invalidated the CFPB's broad theory of RESPA liability. *See PHH Corp.*, 839 F.3d at 40. The D.C. Circuit held that RESPA's safe harbor allows mortgage lenders to make referrals to third parties on the condition that they purchase services from the lender's affiliate, so long as the third party receives the services at a "reasonable market value." *Id*. The D.C. Circuit concluded that RESPA did not prohibit the tying arrangement at issue because it involved "bona fide payments for services and not payments for referrals." *Id*. The D.C. Circuit's application of the Section 8(c) safe harbor is consistent with the Ninth Circuit's interpretation of that provision requiring that "payments are reasonably related to the value of . . . services that were actually performed." *Geraci*, 347 F.3d 751.

Plaintiffs' first theory of RESPA liability—that the co-marketing program is *per se* illegal because it allowed agents to make referrals in exchange for lenders paying a portion of their advertising costs—is neither factually nor legally viable. In contrast to the tying-arrangement at issue in *PHH Corp.*, which explicitly involved the referral of mortgage insurance business in exchange for the purchase of re-insurance from the referring business, Zillow's co-marketing program, based on Plaintiffs' allegations, allows agents and lenders to jointly advertise their services without requiring agents to refer business to lenders. *See PHH Corp.*, 839 F.3d at 40; (*See* Dkt. No. 35 at 10–13.)

The amended complaint does not contain particularized facts demonstrating that co-marketing agents were actually providing unlawful referrals to lenders. For example, the amended complaint does not contain any allegations that a specific co-marketing agent referred mortgage business to a specific lender in exchange for paying its advertising costs to Zillow. But

even if the Court draws an inference that co-marketing agents were making mortgage referrals, such referrals would fall under the Section 8(c) safe harbor because lenders received advertising services in exchange for paying a portion of their agent's advertising costs. *See* 12 U.S.C. § 2607(c); *PHH Corp.*, 839 F.3d at 40. Therefore, the Court rejects Plaintiffs' theory that the co-marketing program, and by extension Zillow, violated RESPA by allowing lenders to pay a portion of agent's advertising costs.

Plaintiffs' alternative theory of liability is that the co-marketing program facilitated RESPA violations by allowing lenders to pay more than fair market value for the advertising services they received from Zillow. (Dkt. No. 39 at 11.) In other words, Plaintiffs assert that the amount lenders were paying above fair market value for the advertising was a form of *quid pro quo* for receiving referrals from lenders. (*Id.*) (citing *PHH Corp.*, 839 F.3d at 50).

Plaintiffs assert that the co-marketing program let lenders "pay a greater share of the marketing budget than is justified by the number of leads generated by the program." (Dkt. No. 35 at 17.) Plaintiffs allege that "[b]ecause a lender only receives 4 leads for every 10 received by the broker, if a single lender paid 50% of the agent's advertising costs, the lender is paying 2.5 times more per lead than the agent does." (*Id.*) Plaintiffs suggest the situation is even worse when multiple lenders collectively pay an agent's costs because each lender receives even fewer leads. (*Id.*) ("If as was permitted under the program, five lenders in total contributed 18% each to the agent's monthly budget, for a total of 90% of that budget, they would be paying 22.5 times more per lead than the agent.")

Plaintiffs additionally allege that certain lenders who participated in the co-marketing program refused to pay more than 31% of an agent's advertising costs because that percentage represented the fair market value of the advertising based on the amount of leads received. (*Id.* at 16.) Plaintiffs further allege that Zillow "itself confirmed that a 30% contribution by the lender corresponds to fair market value a lender receives for advertisement vs. the broker." (*Id.*)

While Plaintiffs have explained in detail how the co-marketing program is structured,

they have failed to provide particularized facts that demonstrate co-marketing lenders were paying more than fair market value for the advertising services they received from Zillow. At the outset, the Court notes that Plaintiffs' claims regarding these RESPA violations are supported almost entirely by circumstantial inferences—Plaintiffs have not alleged that Zillow has been charged with, much less found to have violated Section 8(a) of RESPA.[9] The amended complaint does not contain any particularized allegations that specific co-marketing lenders were paying more than fair market value for the advertising services they received from participating in the program. For example, the amended complaint does not allege that a specific co-marketing agent provided a mortgage referral to a specific lender in exchange for that lender paying an amount to Zillow that was above the market value of the advertising services received by the lender. While Plaintiffs assert that a few participating lenders believed 31% of an agent's advertising spend represented the maximum amount a co-marketing lender should spend, they have not alleged that any specific lenders were paying above that amount or, if they were, that such lender considered the amount to be above fair market value.[10]

Further, even if individual lenders were paying more than 31% of an agent's advertising spend, Plaintiffs have not provided particularized facts that support its allegation that the fair market value of co-marketing advertising is roughly equivalent to the percentage of leads a

---

[9] Plaintiffs assume that Zillow's RESPA violations can be inferred from the company's August 2017 disclosure that the CFPB had invited Zillow to discuss a possible settlement and indicated that it intended to pursue further action if those discussions did not result in a settlement. (Dkt. No. 35 at 37.) The Court does not agree that Zillow's disclosure, even when accepted as true, demonstrates that Zillow *violated* RESPA, as Plaintiffs repeatedly suggest throughout the amended complaint. (*See id.*) ("Following the news that the CFPB had determined that the co-marketing program had violated the law . . .").

[10] The Court also declines to accept as true Plaintiffs' allegation that Zillow confirmed that 30% of an agent's advertising spend represented the fair market value of co-marketing services because judicially noticeable materials contradict that assertion. (*See* Dkt. No. 37 at 78); *Sprewell*, 266 F.3d at 988. While a Zillow representative stated in the 2015 webinar that paying 30% of agent's advertising costs was "the sweet spot," he also said "it can work for more, you know, if a lender wants to contribute more and you guys have the right amount of exposure, it does work." (*Id.*)

lender receives. Zillow charges agents for advertising based on the number of impressions received, not on the number of leads received. (Dkt. No. 35 at 10.) That makes sense because leads are not the only advertising benefit that agents and lenders receive from the co-marketing program. Co-marketing lenders appear alongside their agents when Zillow users view an agent's listing. (*Id*. at 12) (image showing a co-marketing listing with lender's picture and contact information appearing below agent's). Just as co-marketing lenders can solicit a prospective buyer based on the receipt of a lead, prospective buyers can contact lenders based on seeing their information on a listing. Certainly this form of advertising, which is entirely separate from the receipt of leads or potential mortgage referrals, carries a monetary value for participating lenders. Plaintiffs' fair market value theory does not account for this exposure. Nor do Plaintiffs' allegations account for the fact that lenders could place differing values on the advertising provided by the co-marketing program—a consideration that is especially relevant given that Plaintiffs have not alleged that specific lenders were paying above fair market value for co-marketing services or how much that amount represented. Plaintiffs have not provided particularized facts that support their claim that co-marketing lenders were paying more than fair market value for the advertising services they received from Zillow in exchange for agents providing mortgage referrals.

Having rejected both of Plaintiffs' theories of RESPA liability, the Court concludes that Plaintiffs' other RESPA allegations against Zillow are similarly unsupported. Plaintiffs allege that Zillow "actively encouraged" agents to make personal recommendations of their co-marketing lenders—i.e., to make illegal referrals. (*Id*.) In support of this allegation, Plaintiffs point to the 2015 webinar, in which a Zillow representative suggested that co-marketing agents and lenders should "tag-team" prospective buyers in order for both to make a sale. (*Id*. at 15.) The Zillow representative stated:

> It's best to have a conversation of when both of you get a contact, who's going to respond first? And then who's going to do the follow-up? There's no reason why you can't do a tag-team scenario and both working these contacts and being quick

on the draw when to get them. And again, I can't say it enough. If you guys are not talking or if you're not talking with the lender, the program will not work.

(Dkt. No. 37 at 82.) These are the only statements that Plaintiffs offer to suggest that Zillow encouraged and instructed agents to refer lenders to homebuyers. (*See generally* Dkt. No. 35.) The representative did not instruct agents to recommend lenders to potential homebuyers, nor can the Court draw such an inference from the above statements. The reasonable inference that the Court can draw from the above statement is that Zillow believed agents and lenders should communicate with one another in order to maximize the chance that they secure a prospective homebuyer's business—that falls short of an instruction by Zillow for agents to refer lenders. The amended complaint does not contain particularized facts that demonstrate Zillow or its representatives actually instructed agents to make referrals, as Plaintiffs' allege.[11]

Plaintiffs' allegation that Zillow designed the co-marketing program to conceal RESPA violations is similarly unsupported by particularized facts. It is unclear to the Court what facts in the amended complaint support this allegation because it seems to support an opposite conclusion. The 2015 webinar, cited repeatedly in the amended complaint, was broadcast to the public, explained how the co-marketing program worked, and provided answers to users' questions. (Dkt. No. 37 at 63–88.) Zillow's public dissemination of information regarding the co-marketing program belies Plaintiffs' allegation that the company was attempting to conceal RESPA violations. It is also notable that this public webinar contains just about all of the material facts that support Plaintiffs' allegations that the co-marketing program violated RESPA. Surely, such public disclosure speaks to Defendants' belief—and the existence or lack of scienter—that the co-marketing was legal. *See infra* Part II.C.3.

For the above reasons, the Court finds that the amended complaint does not contain

---

[11] The amended complaint alleges that during the 2015 webinar Zillow encouraged agents to provide lenders with leads even when users opted out of sending their information to co-marketing lenders. (Dkt. No. 35 at 15.) That allegation is contradicted by the webinar, in which the Zillow representative instructed agents to inform co-marketing lenders that they would only receive about 40% of an agent's leads. (Dkt. No. 37 at 71–72.)

particularized facts that demonstrate Zillow designed the co-marketing program to violate RESPA and to allow lenders and agents to conceal such violations. Nor does the amended complaint sufficiently allege that the co-marketing program was facilitating RESPA violations.

2.   Misleading Statements

Having evaluated Plaintiffs' RESPA allegations, the Court now turns to the specific statements Plaintiffs assert were false or misleading. The alleged statements can generally be classified as dealing with Zillow's general legal compliance, the co-marketing program specifically, and the CFPB's investigation into the program. (*See* Dkt. No. 35 at 21–34.)

a.   *Statements Regarding General Legal Compliance*

On February 18, 2014, Zillow filed a Form 10-K with the SEC in which it stated the following regarding the company's compliance with government regulations:

> [T]he real estate agents, mortgage brokers, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. While we do not believe that we are currently subject to these regulations, we intend to ensure that any content created by Zillow is consistent with them by obtaining assurances of compliance from our advertisers and customers for their activities through, and the content they provide on, our mobile applications and websites.

(Dkt. No. 35 at 22.)[12] Zillow's initial registration statement, which incorporated by reference the February 2014 10-K, also included the merger agreement between Zillow and Trulia. (*Id*. at 23.) The merger agreement included the following warranty: "[n]either Zillow nor any Zillow Subsidiary is in conflict with, or in default, breach or violation of, (a) any Law applicable to Zillow or any Zillow Subsidiary . . . ." (*Id*.)

On February 17, 2015, Zillow filed a Form 10-K that included nearly identical language

---

[12] The February 18, 2014 10-K was incorporated by reference in Zillow's initial registration statement that was signed by Defendants Rascoff and Phillips. (Dkt. No. 35 at 21.) Plaintiffs additionally allege that the following documents contained false and misleading statements because they incorporated the February 2014 10-K by reference: a February 2015 Form S-8, an April 2015 Form S-3, an August 17, 2015 Form S-8 Registration Statement, and an August 21, 2015 Form S-8 Registration Statement. (*Id*. at 25–26.)

as the 2014 10-K regarding its compliance with government regulations. (*Id.*) In that filing, Zillow stated that "[w]e endeavor to ensure that any content created by Zillow is consistent with such laws and regulations by obtaining assurances of compliance from our advertisers and consumers for their activities through, and the content they provide on, our mobile applications and websites." (*Id.* at 23–24.)

Plaintiffs allege that Defendants' statements regarding Zillow's legal compliance—that the company "intended" or "endeavored" to comply with government regulations, and that it was not in conflict, default, or breach of any laws—were misleading because the co-marketing program was designed to allow real estate agents and lenders to violate RESPA, in the ways previously detailed by the Court. (Dkt. No. 35 at 22–23.); *see supra* Part II.C.1. As the Court has explained, however, the amended complaint does not include particularized facts that support Plaintiffs' RESPA allegations against Defendants. *See supra* Part II.C.1. The amended complaint does not allege sufficient facts to demonstrate Defendants intended the co-marketing program to violate RESPA, let alone that Zillow or third parties were actually violating the statute. *See In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 951–52 (9th Cir. 2017) (holding that a corporate defendant's statement that it "endeavored" to comply with an FTC order was not misleading where the complaint lacked particularized facts to show that the defendants knew that a certain practice violated the order).

Therefore, Plaintiffs have failed to provide particularized facts to demonstrate that Defendants' statements regarding Zillow's legal compliance were misleading.[13]

### b. *Non-Disclosure of CFPB Investigation*

Plaintiffs allege that Defendants made misleading statements when failing to disclose information regarding the CFPB's investigation into the co-marketing program. (Dkt. No. 35 at

---

[13] The Court's ruling applies to all of the statements that Plaintiffs allege were misleading for failing to disclose that Zillow's co-marketing program was designed to violate RESPA, and because Zillow allegedly encouraged and instructed agents to commit such violations. (*See* Dkt. No. 35 at 22–33.)

27–30.) As a general matter, federal securities laws do not require corporations to disclose the initiation of a government investigation. *See Basic v. Levinson*, 485 U.S. 224, 234 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Metzler*, 540 F.3d at 1071; *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) ("[A] government investigation, without more, does not trigger a generalized duty to disclose.") While there is no general duty to disclose investigations, corporations have "a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992). Failure to disclose an investigation can be actionable if the corporation makes "some affirmative statement or omission [] that suggested it was not under any regulatory scrutiny." *Metzler*, 540 F.3d at 1071.

During a November 3, 2015 conference call with investors, Defendant Phillips was involved in the following exchange with an analyst:

> **Analyst:** Can you just give us a sense for how much the mortgage co-advertising is contributing to agent revenue? And kind of what penetration is? Where you think it can go? And is the RESPA or CFPB kind of investigations into this is – is this something that should be a concern? Or something that you think is not really an issue?
>
> **Phillips:** Co-marketing with lenders and agents is a very small part of our business, a small contributor to ARPA revenue. Importantly though, we are not seeing lenders depart from this program notwithstanding all of the discussions in the marketplace about the CFPB and the CFPB's recent pronouncements and actions. I can assure you that we work diligently to comply with all of the rules put forth by government agencies and of course, we monitor the CFPB and the things that they are saying and doing to make sure that we remain in compliance and to make sure that we understand how their activities relate to our business.

(Dkt. No. 35 at 26.) Plaintiffs allege that Phillips' statement was misleading "for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA." (*Id.* at 27.) Plaintiffs support that allegation by asserting that Zillow received a subpoena from the CFPB on April 1, 2015, that was "in

connection with an investigation by the CFPB into potential violations of RESPA related to Zillow's co-marketing program."[14] (*Id.* at 19.)

The Court concludes that Phillips' statement was not misleading because it was neither an affirmative statement nor omission that suggested Zillow was not under regulatory scrutiny. In response to the analyst's question regarding CFPB investigations into co-advertising programs generally, Phillips stated that Zillow was monitoring the CFPB's actions in order to remain in regulatory compliance. (*Id.* at 26.) The analyst did not ask if the CFPB was investigating Zillow's co-marketing program, nor did Phillips suggest that the CFPB was not investigating Zillow. Nothing that Phillips said or failed to say in response to the analyst's question suggested that Zillow had not received a civil investigative demand from the CFPB.

The non-binding authority cited by Plaintiffs does not warrant an opposite conclusion. (*See* Dkt. No. 39 at 16–17) (citing *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 2d 711, 729 (S.D.N.Y. 2015)). In *BioScrip*, the district court found that the Plaintiff had plausibly alleged a material misstatement based on the defendant corporation's failure to disclose that it had received a civil investigative demand from a federal agency. 95 F. Supp. 2d at 728. The court reasoned that the defendant's nondisclosure was potentially misleading because of an earlier statement by the corporation that it could give no assurance that it "will not receive subpoenas or be requested to produce documents in pending investigations." *Id.* In other words, the failure to disclose the investigation rendered misleading a previously made statement dealing with the corporation's exposure to such investigations. *Id.* Here, Phillips' failure to disclose the April 2015 subpoena did not render her statements to investors, or any previous statement by Zillow,

---

[14] However, in another section of the amended complaint, Plaintiffs state that Zillow was not notified "of the CFPB's specific legal concerns regarding the co-marketing program" until it received the NORA letter in early 2017. (Dkt. No. 35 at 5.) It appears clear from the amended complaint that Plaintiffs have not seen the actual contents of the April 2015 subpoena, as their allegations are based on "the CFPB Document Submission Standards provided to Plaintiffs in response to a FOIA request," and not the subpoena itself. (*Id.* at 19.)

misleading.[15]

c.    *Non-Disclosure of Changes to Co-Marketing Program*

Plaintiffs allege that Defendants made misleading statements when they failed to disclose that the co-marketing program had been altered in response to the CFPB's investigation. During a May 4, 2017 conference call, Phillips made the following statement in response to a question about whether Zillow had noticed if agents and lenders had changed their behavior in light of the CFPB's investigation:

> In terms of changes in behavior, we haven't observed anything specific, but I can tell you that real estate agents and lenders are pretty keenly aware of the restrictions that are placed upon their co-marketing efforts through RESPA and other regulatory regimes. So they are intent on complying and pay close attention to their own behavior, monitoring themselves. We think through the way we have put this product together enabled agents and lenders to participate in full compliance with the law.

(Dkt. No. 35 at 30–31.) Later that month, Defendant Rascoff gave an interview on an internet-based television channel and said the following about the co-marketing program:

> [T]wo years ago the CFPB started asking us questions about this [the co-marketing program] and we've been talking with them literally for two years. We think the way we've constructed the program is completely compliant and allows agents and lenders to stay within the confines of the laws that govern this, but we're still talking to the CFPB about it so we'll see.

(*Id.* at 32–33.) Plaintiffs allege that the above statements by Phillips and Rascoff were misleading for "failing to disclose that Zillow had already altered the co-marketing program in an attempt to remedy RESPA violations the CFPB had already identified to Zillow." (*Id.* at 32–34.) Plaintiffs allege that in the beginning of 2017, Zillow lowered the percentage of an agent's

---

[15] Plaintiffs additionally allege, and the Court rejects, that the following documents contained misleading statements for failing to disclose the April 2015 subpoena: Zillow's 2015 10-K, a March 2016 Form S-8, an August 2016 Form S-8, Zillow's 2016 10-K, a February 2017 Form S-8. (Dkt. No. 35 at 27–32.) Even if Plaintiffs sufficiently alleged that Defendants' non-disclosure of the 2015 subpoena was misleading, they would be unable to establish loss causation regarding those misstatements because Plaintiffs bought their Zillow securities following Defendants' disclosure of the CFPB's investigation in May 2017. *See infra* Part II.C.4.

advertising costs lenders could collectively contribute based on the CFPB's investigation into the co-marketing program. (*Id.* at 19–20.) Plaintiffs also allege that Zillow concealed this change from the public by not altering its website to reflect the change. (*Id.* at 19.)

Plaintiffs support this claim by providing the testimony of an anonymous witness who allegedly had personal knowledge of Zillow's reasons for changing the co-marketing program. (*Id.* at 19–20.) A securities fraud complaint "relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco Partners*, 552 F.3d at 995. First, the confidential witness must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Second, the complaint must include "adequate corroborating details" of the confidential witness' statements. *Id.*

In this case, the anonymous witness worked as a regional sales manager for Zillow, responsible for "overseeing a team of sales reps that were tasked with upselling and cross-selling to existing customers." (Dkt. No. 35 at 20.) According to the anonymous witness, in early 2017 she and her colleagues "were instructed to explain to agents that Zillow was capping total lender contributions at 50% of total advertising costs." (*Id.*) The amended complaint further alleges that the witness' "understanding was that this change was in response to a government investigation." (*Id.*) The anonymous witness further states that Zillow did not immediately update its website to reflect this change to the co-marketing program. (*Id.*)

The amended complaint sufficiently describes the anonymous witness as someone who was in a position to possess the alleged information, and whose statements are corroborated by other facts alleged in the complaint. The amended complaint demonstrates that the witness held a position within Zillow that would provide her with working knowledge of the co-marketing program. (*Id.* at 19–20.) The witness' statement about the co-marketing program's alteration in early 2017 in response to a government investigation, is corroborated by allegations that the CFPB was conducting such an inquiry during that time period. (*Id.* at 21, 37.)

Notwithstanding the anonymous witness' statements, the amended complaint does not contain particularized factual allegations that demonstrate Phillips and Roscoff's statements were misleading for "failing to disclose that Zillow had already altered the co-marketing program in an attempt to remedy RESPA violations identified by the CFPB." (*Id*. at 34.) While the confidential witness states that she believes the changes were implemented in response to a government investigation, neither she, nor the amended complaint, contain particularized facts that demonstrate the co-marketing program was altered to "remedy RESPA violations identified by the CFPB." (*Id*. at 34.) The amended complaint does not contain particularized factual allegations that the CFPB informed Zillow that it violated RESPA, much less how such violations occurred. (*See generally* Dkt. No. 35.) As the Court has previously explained, Plaintiffs have not provided particularized facts that demonstrate that the co-marketing program, and by extension Zillow, violated RESPA. *See supra* Part II.C.1.

Without additional particularized facts regarding the reasons Zillow altered the co-marketing program, Plaintiffs have failed to allege that Phillips and Rascoff's statements were misleading or false.

### 3. Scienter

In the context of a securities fraud claim, scienter is a mental state that is characterized by an intent "to deceive, manipulate, or defraud." *Metzler*, 540 F.3d at 1065–66 (citation omitted). In the Ninth Circuit, scienter requires that a defendant make false or misleading statement "intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 995.

To adequately plead scienter, the PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To plead a "strong inference" of scienter an inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *WPP Luxembourg*, 655 F.3d at 1051–52 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). Additionally, a court

must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 322–23. The Ninth Circuit has established the following two-step inquiry to determine whether a securities fraud complaint pleads a strong inference of scienter:

> [F]irst, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.

*Zucco Partners*, 552 F.3d at 992. When assessing whether a plaintiff has adequately pled a strong inference of scienter, courts must consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *In re Daou Sys., Inc.*, 411 F.3d at 1022 (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002)).

As the Court has previously explained, the amended complaint does not contain sufficiently particularized facts to adequately allege that Defendants made false or misleading statements regarding Zillow's legal compliance or the CFPB's investigation into the co-marketing program. *See supra* Parts II.C.1, II.C.2. Therefore, the facts pled in support of those allegedly misleading statements neither individually nor collectively evince a strong inference that the Defendants made statements with an intent to deceive shareholders. *See id.* The amended complaint includes additional allegations in support of establishing Rascoff and Phillips' scienter—the Court will evaluate each of these allegations individually, and then analyze whether all of the allegations, when taken as a whole, support a strong inference of scienter.

### a. Additional Allegations Supporting Rascoff's Scienter

Plaintiffs allege that Rascoff's scienter can be inferred from the fact that he had been made aware of a separate 2014 lawsuit that included an allegation that individuals were using the co-marketing program to violate RESPA. (Dkt. No. 35 at 38–39.) In that lawsuit, the plaintiff alleged that she informed Zillow executives that lenders were using the co-marketing program to register fake agent accounts in violation of RESPA. (*Id*. at 39.) Plaintiffs further allege that

Rascoff knew of the plaintiff's allegations and was therefore "aware of red flags that the co-marketing program could be used to evade RESPA." (*Id.*)

Rascoff's alleged knowledge of another lawsuit dealing with unrelated RESPA allegations does not support a strong inference of scienter. First, the allegations made in the other lawsuit—that lenders were registering fake accounts—bear no resemblance to Plaintiffs' allegations this lawsuit—that co-marketing agents were making illegal referrals to lenders in exchange for the lenders paying above market value for advertising services. (*See generally* Dkt. No. 35.) Second, the complaint does not offer particularized facts to explain how the conduct in the other lawsuit violated RESPA. These vague allegations do not allow the Court to conclude that Rascoff made statements with the requisite scienter.

Plaintiffs additionally allege that Rascoff's scienter can be inferred "from his participation in investor conference calls where Defendants made false exculpatory statements, and his thorough preparations for those conference calls." (*Id.* at 39.) Plaintiffs describe in detail how Rascoff thoroughly prepared for the relevant conference calls: that he reviewed emails provided to him from each of Zillow's departments and that he spent several days prior to the calls preparing his remarks. (*Id.* at 39–40.) Given his preparation, Plaintiffs assert that Rascoff's statements on the calls "could not have been innocently made." (*Id.* at 39.)

The Court has already determined that the amended complaint does not contain particularized facts to demonstrate, as Plaintiffs allege, that Rascoff or Phillips made false statements. *See supra* Part II.C.2.b. While Plaintiffs allege that Rascoff's preparation before conference calls demonstrates that he would have been aware that the co-marketing program violates RESPA, the Court can draw a different, yet equally compelling inference from Rascoff's preparation: that he wanted to ensure that what he and other Zillow executives said on the call was accurate. *See In re Daou Sys., Inc.*, 411 F.3d at 1006 (the Court must consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.")

Finally, Plaintiffs allege that Rascoff's scienter can be inferred from several allegedly misleading statements that he made during a May 2017 interview. (Dkt. No. 35 at 40.) In that interview, Rascoff stated that:

> We think the way we've constructed the program is completely compliant and allows agents and lenders to stay within the confines of the laws that govern this, but we're still talking to the CFPB about it so we'll see. We haven't disclosed the amount of revenue, we've said it's small, but we haven't disclosed it, and, you know, it's an ongoing conversation.

(*Id*. at 33–34.) When asked "if it's a case where you had to alter the co-marketing program how much of an impact would it be on the company," Rascoff responded that "it's really hard to speculate hypothetically because we have no idea whether this ends up being blessed or not. It could have no impact or it could have an impact." (*Id*. at 34.)

Plaintiffs assert that Rascoff's statements were intended to be misleading because the co-marketing program did not provide Zillow with a "small" amount of revenue, the program was not compliant with RESPA, and Zillow had already altered the program in response to the CFPB's investigation. (*Id*. at 40.) Plaintiffs assert that the co-marketing program did not provide a small amount of revenue based on a 2017 independent analysis that concluded 10% of Zillow's revenue had exposure to the co-marketing program. (*Id*. at 36.) The analysis Plaintiffs cite does not provide particularized facts that demonstrate Rascoff's characterization of co-marketing revenues as "small" was false. Nor does it allow the Court to draw a strong inference of scienter. Moreover, the Court has already ruled that the amended complaint has not alleged sufficient facts to demonstrate that the co-marketing program violated RESPA or that the program was altered in order to remedy RESPA violations. *See supra* Parts II.C.1., II.C.2, II.C.3. Therefore, the Court cannot conclude that Rascoff's statements regarding the co-marketing program's compliance with RESPA evinced a strong inference of scienter.

### b. Additional Allegations Supporting Phillips' Scienter

Plaintiffs allege that Phillips' scienter can be inferred from: (1) her preparation for and false statements during several conference calls; (2) suspicious sales of Zillow securities during

the class period; (3) her dual position as Zillow's Chief Financial Officer and Chief Legal Officer and (4) her role in performing due diligence with respect to Zillow's merger with Trulia. (Dkt. No. 35 at 40–43.) As with Plaintiffs' allegations against Rascoff, the Court concludes that Phillips' preparation for conference calls and her statements during those calls do not demonstrate a strong inference of scienter. *See supra* Part II.C.3.a.

Suspicious stock sales can provide circumstantial evidence of scienter, so long as they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989)). Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history. *Id.*

Plaintiffs allege that on May 9, 2017, Phillips exercised options to purchase 28,203 shares of Zillow Class A and Class C stock, and then immediately sold the stock for $1,206,866.41, generating a profit of $916,418.50. (Dkt. No. 35 at 41.) Plaintiffs assert this stock sale is indicative of Phillips' scienter because they were not conducted pursuant to a pre-existing trading plan, were her first sales in two years, and resulted in a profit of more than double her annual salary. (*Id.* at 42.)

Judicially noticeable materials demonstrate that Phillips' stock sales should not be viewed as circumstantial evidence of scienter. The sales in question represented less than 10% of Phillips' Class A shares and less than 5% of her Class C shares. (Dkt. No. 37 at 112–24.) The Ninth Circuit has held that significantly larger stock sales fail to demonstrate a strong inference of scienter. *See Metzler*, 540 F.3d at 1067 (executive's sale of 37% of shares during class period did not raise strong inference of scienter).

The Court does not perceive, and Plaintiffs do not specify, how the timing of Phillips' sale demonstrates her scienter. The sale immediately followed Zillow's disclosure of the CFPB's

investigation into the co-marketing program, and a warning that the company could potentially face future legal action stemming from the CFPB's inquiry. (*Compare* Dkt. No. 35 at 35, *with* Dkt. No. 37 at 118.) The Court would expect a suspicious stock sale to proceed, not follow such a disclosure. Finally, the stock sales at issue were not dramatically out of line with Phillips' prior sales. In February 2015, which is part of the proposed class period, Phillips sold almost 20% of her Zillow securities—a substantially larger percentage than the sales Plaintiffs allege are suspicious. (*See* Dkt. No. 37 at 126–127.)

Plaintiffs next allege that Phillips' scienter can be inferred from her position as Zillow's CFO and CLO. In those roles, Plaintiffs allege Phillips had knowledge of the CFPB's investigation into the co-marketing program. (Dkt. No. 35 at 42.) Plaintiffs similarly allege that because Phillips "was responsible for conducting due diligence on the merger with Trulia with respect to legal matters, [she was] therefore responsible for ensuring the truth of Zillow, Inc.'s representation that none of Zillow's operations were in breach or violation of any applicable laws." (*Id.*)

"Corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087–88 (9th Cir. 2002). Although Phillips' role within Zillow almost certainly made her privy to the CFPB's investigation, the Court can only infer scienter from that fact if Phillips made misleading statements about information gained through her position. Plaintiffs' scienter allegations presume that Phillips made false statements about the co-marketing program and the CFPB investigation. (Dkt. No. 39 at 21) ("the Complaint provides detailed allegations that demonstrate Defendant's actual knowledge of the fraud."). However, as the Court has ruled, the amended complaint has not sufficiently alleged that Phillips made any material misleading statements. *See supra* Part II.C.2.

Nor does the Court think a strong inference of scienter is demonstrated through Phillips'

role in performing due diligence with respect to Zillow's merger with Trulia. Plaintiffs allege that the merger process "would have caused [Phillips] to pay close attention to the legality of the co-marketing program." (Dkt. No. 35 at 42.) Again, this allegation presumes that the co-marketing program actually violated RESPA. Since the amended complaint does not contain particularized facts that demonstrate Zillow violated RESPA, the Court cannot infer scienter from Phillips' representation during the merger that "[n]either Zillow nor any Zillow Subsidiary is in conflict with, or in default, breach or violation, of (a) any Law applicable to Zillow or any Zillow Subsidiary." (*Id*. at 43.)

For those reasons, none of the above allegations, taken individually, support a strong inference of Phillips' scienter.

### c. Scienter Allegations Taken as a Whole

Plaintiffs allege that Defendants' actions during the class period support a strong inference of scienter because they evince an intent to mislead shareholders about the legality of the co-marketing program. (*See* Dkt. No. 39 at 20–24.) The Court concludes that the allegations in the amended complaint, taken collectively, support a contrary and more compelling inference—that Defendants believed the co-marketing program did not violate RESPA. Because the Court must consider all inferences, even those unfavorable to Plaintiffs, it finds that the amended complaint does not support a strong inference of scienter.

As the Court has already explained, Plaintiffs' scienter allegations are premised on the idea that the co-marketing program violates RESPA, and that the CFPB informed Zillow of such violations. (*See* Dkt. No. 35 at 38–44.) However, Plaintiffs have not provided particularized allegations to support their theory of RESPA liability. Nor does the amended complaint contain sufficient allegations to support that the CFPB determined that Zillow violated RESPA.

Further, the statements that Plaintiffs allege are misleading also evince a belief that the program was legal. In its general legal compliance statements made prior to the CFPB's investigation, Zillow asserted that it did not believe it was subject to "federal laws and

regulations relating to real estate, rentals and mortgages," but that it also "intended" and "endeavored" to ensure that content it created was compliant. (Dkt. No. 35 at 22, 24.) The amended complaint notes that "[i]n 2015, the CFPB dramatically stepped up RESPA enforcement." (*Id.* at 17.) Prior to that time, however, prevailing federal regulations appeared to allow for the type of joint-advertising that the co-marketing program facilitates. (*See id.* at 14.) Moreover, Plaintiffs' theories of RESPA liability are admittedly based on the CFPB's "expansive view" of the law, which it began espousing years after the co-marketing program was introduced. (*Id.* at 13–14.) Therefore, Zillow's representations prior to 2015 that it did not believe it was subject to laws such as RESPA or that it endeavored to comply with such laws does not demonstrate an intent to mislead the public about the co-marketing program's legality.

Plaintiffs also point to the 2015 webinar as evidence that Zillow knew the co-marketing program violated RESPA. (Dkt. No. 39 at 22.) The Court believes the more compelling and cogent inference to be drawn from that presentation is that Zillow thought the co-marketing program was above board. While acknowledging that the CFPB had begun to scrutinize products such as the co-marketing program, Zillow's representative expressed that the company, and participating third parties, thought the arrangement was lawful.[16] (*See* Dkt. No. 37 at 63–89.) The Court views the webinar as a demonstration that Zillow thought the co-marketing was legal—not as a public announcement that the company and its users were breaking the law.

Even after Defendants disclosed the CFPB's investigation, they consistently expressed a belief that the co-marketing program was lawful. In response to Zillow receiving the CFPB's NORA letter, Phillips stated that "we believe our co-marketing program has, and continues to allow agents and lenders to comply with the laws while using our product." (*Id.* at 30.) Rascoff similarly stated that "[w]e think the way we've constructed the program is completely compliant

---

[16] The Court also notes that neither Phillips nor Rascoff are alleged to have been involved with or aware of the 2015 webinar. Therefore, none of the representations made in that presentation can be used to infer Phillips or Rascoffs' scienter. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008).

and allows agents and lenders to stay within the confines of the laws that govern this . . . ." (*Id*. at 32.) When Zillow disclosed that it had received the CFPB's NORA letter, it stated in an SEC filing "[w]e continue to believe that our acts and practices are lawful and that our co-marketing program allows lenders and agents to comply with RESPA." (Dkt. No. 37 at 34.) When Zillow disclosed that the CFPB invited the company to enter settlement negotiations, it reiterated that "[w]e continue to believe that our acts and practices are lawful and that our comarketing program allows lenders and agents to comply with RESPA, and we will vigorously defend against any allegations to the contrary." (*Id*. at 37.) All of these statements, particularly in light of Plaintiffs' failure to allege a RESPA violation, demonstrate that the allegations in the amended complaint do not support a strong inference of scienter.

### 4. Loss Causation

"Broadly speaking, loss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (citation omitted). To successively plead loss causation, a plaintiff must plausibly allege that the decline in the defendant's share price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors. *Metzler*, 540 F.3d at 1062. Put another way, the plaintiff must plausibly allege that the defendant's fraud was "revealed to the market and caused the resulting losses." *Id.* at 1063.

Plaintiffs have failed to allege loss causation because the amended complaint does not adequately plead any material misleading statements by Defendants. *See supra* Part II.C.2. The Court will decide, however, whether Plaintiffs could allege loss causation if they file an amended complaint that adequately alleged a material false or misleading statement.

Plaintiffs purchased their Zillow securities after the company disclosed the CFPB's investigation into the co-marketing program, but before Zillow announced that the CFPB had ended its investigation and invited it to participate in settlement negotiations. (*See* Dkt. Nos. 16-

2, 35 at 7.) Plaintiffs assert that "the revelation of the CFPB's intention to file charges was corrective because, unlike the investigation, it was a conclusion by the CFPB that Zillow violated the law." (Dkt. No. 39 at 26.) Defendants counter that Plaintiffs bought their securities knowing that there was potential risk of the CFPB taking an enforcement action based on Zillow's initial disclosures regarding the investigation. (Dkt. No. 36 at 24.)

It is clear that an announcement of an investigation into potentially fraudulent conduct, without more, is insufficient to support loss causation. *See Loos*, 762 F.3d 880. On the other hand, the findings of an investigation into a corporation's fraudulent conduct are sufficient to plausibly allege loss causation. *See In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1227 (N.D. Cal. 2015). The facts of this case fall somewhere in the middle—Zillow's August 2017 disclosure that the CFPB had invited it to enter settlement talks was neither the initiation of an investigation, nor a finding of fraudulent conduct. Because loss causation does not need to be alleged with factual particularity, the Court concludes that if Plaintiffs amend their complaint and successfully plead that Defendants made a material misleading statement regarding the co-marketing program's compliance with RESPA, then they could plausibly allege that Zillow's August 2017 statements represented a "corrective disclosure" that would support loss causation. *See Metzler*, 540 F.3d at 1063–64.

### 5. Control Person Liability

Section 20(a) of the Exchange Act makes certain "controlling" individuals also liable for violations of Section 10(b) and its underlying regulations. *See* 15 U.S.C. § 78t(a). "A defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *No. 84 Emp'r–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (citation and internal quotation marks omitted). "Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary

violation of section 10(b)." *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993). Because Plaintiffs have failed to adequately allege a violation under Section 10(b), their Section 20(a) claims as pled in Count II of the amended complaint are DISMISSED without prejudice and with leave to amend.

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 36) is GRANTED and Defendants' request for judicial notice (Dkt. Nos. 38, 43) is GRANTED in part and DENIED in part. Plaintiffs' Exchange Act claims as pled in counts I and II are DISMISSED without prejudice and with leave to amend. In accordance with the Court's rulings, if Plaintiffs choose to file a second amended complaint, they must assert particularized facts that demonstrate that Zillow designed the co-marketing program to violate RESPA, and that Zillow was instructing and encouraging third-parties to commit such violations. Plaintiffs must additionally allege with particularity that Defendants made material false or misleading statements regarding the co-marketing program's compliance with RESPA, that Defendants' statements evinced a strong inference of scienter, and that such statements caused the loss alleged by Plaintiffs. The second amended complaint shall be filed within forty- five (45) days of this order. Plaintiffs' Securities Act claims as alleged in counts III and IV are DISMISSED with prejudice.

DATED this 2nd day of October 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE