1    The Honorable John C. Coughenour

2

3

4    UNITED STATES DISTRICT COURT
5    FOR THE WESTERN DISTRICT OF WASHINGTON
     AT SEATTLE

6
   In re Zillow Group, Inc.
7  Securities Litigation                      No. 2:17-cv-01387-JCC

8

9                                             **SECOND CONSOLIDATED**
                                              **AMENDED COMPLAINT**
10

11                                            **JURY TRIAL DEMANDED**
12

13       Lead Plaintiffs Jo Ann Offutt, Raymond Harris, and Johanna Choy
14
   ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by
15
   their undersigned attorneys, for their complaint against Defendants, allege the
16
   following based upon personal knowledge as to themselves and their own acts,
17
18 and information and belief as to all other matters, based upon, *inter alia*, the
19
   investigation conducted by and through their attorneys, which included, among
20
   other things, a review of the Defendants' public documents, conference calls and
21
22 announcements made by Defendants, United States Securities and Exchange
23 Commission ("SEC") filings, wire and press releases published by and regarding
24
   Zillow Group, Inc. ("Zillow" or the "Company"), analysts' reports and advisories
25
26 about the Company, and information readily obtainable on the Internet. Plaintiff

SECOND CONSOLIDATED AMENDED COMPLAINT - 1

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Zillow securities between November 17, 2014 and August 8, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against the Company and certain of its top officials.[1]

2.      Zillow operates the leading online real estate market place in the United States.  Through several brands including Zillow, Trulia, HotPads and Naked Apartments, it provides real estate listings to buy or rent for potential customers.

3.      Zillow's primary source of revenue is selling advertising to real estate professionals, and its largest customer base is real estate agents.  Agents pay to list properties on Zillow's various platforms with their name attached to the listing, and prospective buyers can provide their contact information and ask to be contacted by an agent, providing the agent with a "lead".

---

[1] During the class period, two classes of shares of Zillow stock publicly traded. Class A common stock traded throughout the class period and Class C Capital stock traded from August 3, 2015 onward. Both shares have identical economic rights, but Class C shares have no voting rights. Both shares traded at a near 1 to 1 price ratio throughout the class period.

4.    Real estate agents are primarily interested in advertising on Zillow for the purpose of obtaining these leads.  However, Zillow does not charge per lead.  Zillow, instead, charges per "impression" – that is, an advertiser pays each time a customer views a listing, whether or not the customer chooses to submit his information to the agent.

5.    In 2013 Zillow launched a "co-marketing" program to allow lenders to appear alongside the real estate agent in advertisements, in exchange for the lender making a fixed monthly payment to Zillow, which defrays a fixed percentage of the agent's monthly ad spend.  Zillow also forwarded the agents' customer leads to the lenders, although a customer who inputs their information could opt out of having their lead provided to a lender by unchecking the box titled "I would like to receive financing information."

6.    By bringing the co-marketing concept into the online realm, Zillow stepped into perilous legal territory because it is illegal under RESPA for a lender to pay a real estate agent for referrals or leads.  In addition, it is illegal under the Consumer Financial Protection Act to provide "substantial assistance" to another person or entity's violation of consumer protection acts, including RESPA.

7.    Longstanding HUD regulations make clear that under RESPA, it is illegal for a lender to pay a real estate agent in exchange for that agent making any sort of personal recommendation of that lender. However, RESPA contains a safe

harbor provision that states that its ban on payments for referrals is inapplicable to fair market value payments for legitimate services.

8.      Thus, Zillow, as the market leader in online real estate advertising, had the ability to ensure that their co-marketing program was compliant by requiring that lenders participating in the program pay fair market value for the advertising they purchased.

9.      Instead, Zillow charged lenders far in excess of the fair market value of those services.  Moreover, Zillow actively monitored and encouraged lenders and agents to violate RESPA, contacting agents to make sure they are making referrals.  Thus, although the only lawful service the co-marketing program can provide is the sharing of advertising space, Zillow designed the program with the understanding that agents would nonetheless use it to violate RESPA by making illegal referrals to lenders.  Thus, the co-marketing program does not work unless everyone involved violates the law.

10.     Due to these egregious RESPA violations, the CFPB launched an investigation into Zillow, centered around the co-marketing program, in April 2015.  Zillow did not disclose this investigation to investors until May of 2017, after receiving a "notice and opportunity to respond and advise" letter, notifying Zillow of the CFPB's specific concerns regarding the co-marketing program was illegal.  Even then, Zillow downplayed the seriousness of the situation, falsely reassuring investors that the program, which was in fact an enormous contributor

to Zillow's bottom line, was "small" and falsely claiming that Zillow was still confident that their program was compliant, when in reality Zillow changed the co-marketing program to comply with RESPA in the beginning of 2017 in response to CFPB warnings.

11.     On August 8, 2017, the Company was forced to admit the seriousness of their legal jeopardy, acknowledging that they had been notified by the CFPB that it intended to charge Zillow with RESPA violations if it did not reach a settlement.  Following this news, Zillow's share price fell $7.43, or 15.5%, over the following two trading days to close at $40.50 on August 10, 2017.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

15.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Zillow's principal executive offices are located within this Judicial District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

17.     Offutt, as set forth in the previously filed Certification (Docket No. 15-2), incorporated herein by reference, acquired and held shares of the Company at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions. Throughout the Class Period, Offutt was unaware of the false and misleading misrepresentations and omissions set forth herein.

18.     Harris, as set forth in the previously filed Certification (Docket No. 15-2), incorporated herein by reference, acquired and held shares of the Company at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions. Throughout the Class Period, Harris was unaware of the false and misleading misrepresentations and omissions set forth herein.

19.     Choy, as set forth in the previously filed Certification (Docket No. 15-2), incorporated herein by reference, acquired and held shares of the Company at artificially inflated prices during the Class Period and has been

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

damaged by the revelation of the Company's material misrepresentations and material omissions. Throughout the Class Period, Choy was unaware of the false and misleading misrepresentations and omissions set forth herein.

20.     Defendant Zillow is incorporated in Washington, with principal executive offices located at 1301 Second Avenue, Floor 31, Seattle, Washington 98101. Zillow's shares trade on the NASDAQ under the ticker symbol "Z." Zillow was formerly known as Zebra Holdco, Inc. ("Zebra").

21.     On September 12, 2014, Zillow, then known as Zebra, filed a Registration Statement on Form S-4 with the SEC (the "Initial Registration Statement"). The Form S-4 Initial Registration Statement was subsequently amended on October 20, 2014 and November 10, 2017. The purpose of this registration statement was to effectuate the merger of Zillow, Inc. and Trulia, Inc. under a stock for stock exchange in which holders of both Zillow, Inc. stock and Trulia, Inc. stock would receive Zillow stock in exchange for their shares of the two predecessor companies. The Initial Registration Statement contained a preliminary prospectus. The Initial Registration Statement was declared effective by the SEC on November 17, 2014. Zillow filed its final prospectus on November 18, 2014 (the "Prospectus").

22.     Defendant Spencer M. Rascoff ("Rascoff") has served as the Company's Chief Executive Officer ("CEO") since July 2011, and a Director since 2011.  Rascoff joined Zillow as one of its founding employees in 2005 as Vice

President of Marketing and Chief Financial Officer and served as Chief Operating Officer from December 2008 until he was promoted to Chief Executive Officer.

23.     Defendant Kathleen Phillips ("Phillips") has served as the Company's Chief Financial Officer ("CFO") since August 2015, Chief Legal Officer since September 2014, and Secretary since July 2010.  Her prior positions with the Company include Chief Operating Officer from August 2013 to August 2015 and General Counsel from July 2010 to September 2014.   Ms. Phillips has approximately 20 years experience as an attorney.  Upon Ms. Phillips elevation to CFO, Rascoff noted that "Kathleen has been at the center of all of Zillow's key business initiatives for the last five years."

24.     The defendants referenced above in ¶¶ 20-23 are sometimes referred to herein as the "Individual Defendants."

25.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

26.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

27.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

**Background**

28.     Zillow Group, Inc. operates the "leading real estate and home related information market places on mobile and the web" through the brands Zillow, Trulia, StreetEasy, HotPads, and Naked Apartments.   The Company provides information about homes, real estate listings, and mortgages through websites and mobile applications associated with these brands.   Zillow sells advertising on these websites to real estate agents and mortgage professionals. Selling advertisements to real estate agents is Zillow's primary form of revenue.

29.     Real estate agents can advertise on Zillow by paying to place listings for homes for sale, with their names appended to the listing.   The listing also includes a form for a prospective buyer to provide their contact information. Agents who purchase premium advertising services are referred to as "Premier Agents."  Zillow's advertising fee structure is based on "impressions" – that is, the agent pays Zillow each time a prospective buyer views the agent's advertisement. However, what agents really care about is leads.   That is, agents use Zillow's platform not because they simply wish to have prospective customers view their listings, but so that those customers submit their contact information on the website to the agent allowing the agent to follow up with them.

30.     In 2013 Zillow launched its co-marketing program.   As Rascoff explained in a 2017 interview with cheddar.com, the concept of co-marketing in general long pre-dates the internet.   For instance, it is a longstanding practice in

HALL & GEORGE PLLC

the real estate industry for real estate agents to send direct mail advertisements to prospective buyers.  In some cases, a lender might agree to pay for a portion of the advertising cost in exchange for being identified as a "preferred lender" of the agent on the direct mailer.  Zillow, however, was the first company that allows mortgage lenders to pay for portions of agents' monthly advertising costs on an internet based platform.  In exchange for paying a portion of those costs, the mortgage lender appears at the bottom of the real estate agent's ad as that agent's "preferred lender".  The ad has a form for the customer to submit their contact information to the agent and includes a "check box" that states "I want to be pre-approved."  The box is checked by default, and if that box is not unchecked, the contact information provided to the agent is also provided to the lender.  If the prospective buyer unchecks the box, the real estate agent is notified, so that the real estate agent can forward the contact information to the lender.   A sample of such an ad is below.



31.     Though Rascoff has analogized Zillow's co-marketing programs with earlier print co-marketing programs, this comparison elides an important difference – unlike print mailings which sell advertising space to lenders and agents, Zillow is not merely selling advertising, but is also delivering leads directly to lenders and agents.   Zillow's process for delivering leads to lenders is a ruse to mask lenders' compensation to agents for referrals.

32.     The Real Estate Settlement Procedures Act ("RESPA") was designed to "eliminat[e] … kickbacks or referral fees that tend to increase unnecessarily the

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

costs of settlement services."   12 U.S.C. § 2601(b)(2). RESPA prohibits "any fee, kickback or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).   However, RESPA also states that "[n]othing in this section shall be construed as prohibiting . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. 2607(c)(2).

33.   Enforcement of RESPA was previously assigned to the Department of Housing and Urban Development ("HUD") before being transferred to the Consumer Financial Protection Bureau ("CFPB") in 2011, pursuant to the Consumer Financial Protection Act, passed in 2010. HUD issued an interpretive rule in 2010 finding that payments from home warranty companies to real estate agents for marketing services directed at particular homebuyers constituted payments for referrals.  FR Doc. 2010–15317.  That is, under the HUD regulations, while it is not illegal for a mortgage servicer such as a home warranty company or a lender to pay for advertising directed at the general public, it is illegal for such a company to pay a real estate agent for a direct recommendation of the mortgage service provider from the real estate agent directly to a prospective buyer.  That is because such agents are in a position of trust with respect to the purchaser. Although HUD is no longer the regulator for RESPA, this rule is still in effect.

34.     HUD also stated that RESPA Section 8(c)(2) constitutes a safe harbor for transactions subject to a two part test.   First, any payments must be compensation for bona fide services performed.   Second, the payments must bear a "reasonable relationship to the value of goods or services actually performed" excluding any referrals.   HUD has guided that "payments must be commensurate with that amount normally charged for similar services, goods or facilities. This analysis requires careful consideration of fees paid in relation to price structures and practices in similar transactions and in similar markets." RESPA Statements of Policy, 2006 WL 3948236, at *4.

35.     In addition to transferring enforcement authority, the Consumer Financial Protection Act made it unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 5531 of this title, or any rule or order issued thereunder, and notwithstanding any provision of this title, the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided."   12 U.S.C. § 5536. Section 5531 prohibits "a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service."   Brokers and lenders are covered persons under the statute.

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

36.     After the CFPB took over enforcement of RESPA, it brought several enforcement actions in 2015 related to the sharing of advertising costs and issuing a compliance bulletin on October 8, 2015, raising concerns about "marketing services agreements" whereby real estate agents enter into contracts with lenders, insurers, or others to share marketing costs.  The CFPB did not say such MSAs are inherently illegal under RESPA, but stressed serious skepticism that such agreements are legitimate.  The CFPB stated that "many MSAs are designed to evade RESPA's prohibition on the payment and acceptance of kickbacks and referral fees" and that it "received numerous inquiries and whistleblower tips from industry participants describing the harm that can stem from the use of MSAs, but has not received similar input suggesting the use of those agreements benefits either consumers or industry."

**Zillow's Co-Marketing Program Violated RESPA**

37.     Zillow's co-marketing program was introduced in June of 2013.  At that time, and until the beginning of 2017, Zillow permitted any individual lender to cover up to 50% of the Premier Agent's monthly advertising spend, and up to 5 lenders to cover 90% of the Premier Agent's advertising spend.  If one lender co-markets with the agent, that lender appears alongside the agent in every advertisement, regardless of the contribution.  However, if multiple lenders participate, then they are shown at random alongside the agent in accordance with their pro rata contribution.

38.     According to a webinar dated March 23, 2016 by Andrew Hafzalla, Zillow's director of industry outreach, and Adam Wilson, Zillow's product specialist team leader for Zillow Premier Agents, because a prospective home buyer can opt out of Zillow forwarding their information to a co-marketing lender when asking to be contacted by the real estate agent, in practice, on average, the lenders receive 40 contacts for every hundred contacts received by the agent. However, as explained in that webinar, the agent is also provided a list of all prospective buyers who opted out of providing their information to the lender, and Zillow encourages the agent to provide that information to the lender themselves.

39.     That same webinar also explained that, although Zillow allows lenders to pay up to 50% of the advertising costs of a Premier Agent, several lenders including Wells Fargo and Prime Lending forbid their employees from paying more than 31% of the cost of an agent's advertising, based on the fact that they only receive 4/10 of the number of referrals from Zillow, and that therefore the 31% spend represents the fair market value of co-marketing services, as opposed to any benefits from referrals that might accrue.

40.     Zillow itself confirmed that a 30% contribution by the lender corresponds to fair market value a lender receives for the advertisement vs. the broker.  Zillow suggested to agents at that webinar that it is appropriate to start by

asking a lender for a 30% contribution but once the lender gets "a taste for the contacts and how it all works" the agent can increase the asked-for contribution.

41.     The fact that lenders received far fewer leads than agents was confirmed by AW1[2].  AW1 was an "Inside Sales Manager" at Trulia beginning in 2012.  She continued in that role at Zillow after the merger.  Eventually her title was changed to Regional Sales Manager, but her responsibilities remained the same, other than the fact that her new sales team was regionally based, rather than consisting of sales people throughout the country.  AW1 was responsible for overseeing a team of sales reps that were tasked with upselling and cross-selling to existing customers.  AW1 confirmed that lenders are only notified or in receipt of a lead when the consumer "clicking" on the real estate agent profile also checks the box requesting information about the lender or seeking pre-approval information.  AW1 noted that consumers rarely request this information because they are seeking information about a particular property and first want to contact the real estate agent.  As such, lenders receive minimal leads from consumers "clicking" on Zillow.  However, she said most homebuyers do not already have lenders.  Therefore, real estate agents typically raise the issue of securing a lender with prospective buyers and providing information about suggested lenders.

---

[2] All references to AW refer to anonymous witnesses contacted by Plaintiff's investigator.  All references to AW use the pronoun "she" regardless of gender to preserve anonymity.

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

42.     In addition, she was aware that real estate agents provided access to their Zillow accounts to the lenders to access leads.  She noted that the leads accessed this way would be people who did not expressly request to be contacted by a lender.  When asked why lenders would continue to participate in Zillow's co-marketing program when there were few click-throughs, she said it was because lenders expected real estate agents to refer business.  She did not believe lenders recoup advertising costs through leads from the Zillow site but through the referral relationship forged with the real estate agent.

43.     AW2 was a former Zillow Sales and Operations Trainer in Denver. AW2 worked for Trulia prior to Zillow, and stayed on with Zillow until October 2017.  AW2 described her position as training the Zillow Sales Team on "new operations" for the company and training new hires.  AW2 was responsible for training new hires regarding the Co-Marketing program, including how to talk to real estate agents about the program and the "operations behind it."   AW2 further recalled that in late spring/early summer of 2017, following Zillow's receipt of a letter from the CFPB, AW2 was responsible for training the Denver and Orange County, CA offices on the new messaging to agents regarding the Co-Marketing program.  AW2 stated that "Every agent and lender knew that the Co-Marketing program was for the lender to get leads and referrals."  "Everyone knew that the lenders paid the agents for leads and referrals."  Nevertheless, AW2 trained Zillow Sales Reps to pitch co-marketing to real estate agents by explaining to them that

the program was an opportunity for the agent with a relationship with a lender for them to both get more exposure.  But, AW2 reiterated, "it was understood that lenders were paying for referrals."  For instance, AW2 explained, Zillow Sales Reps were trained to track the number of referrals lenders received from the Co-Marketing program.  AW2 explained that once a quarter, Zillow Sales Reps contacted each real estate agent customer to conduct a "business assessment."  Part of the business assessment inquired with real estate agent customers "how much they did in lender referrals."

44.     AW2 further explained that she was responsible for handling "escalated" calls from agents that had a problem with their account.  AW2 recalled one such call in which a Zillow agent in New York escalated a call to AW2.  The real estate agent wanted to cancel advertising with Zillow for an account that had generated $3,000 per month in revenue.  The real estate agent explained to AW2 that the agent wanted to cancel "because the lender doesn't want to pay anymore."  AW2 explained that the lender had been paying 100% of the co-marketing costs for approximately 2 1/2 years.  AW2 also stated that when she asked Zillow management questions about he Co-Marketing program, she was "reminded to not ask questions."

45.     Thus, despite the fact that RESPA regulations clearly prohibit real estate agents from making personal recommendations for specific lenders to prospective home buyers, Zillow designed the co-marketing program to facilitate

just such contacts, and tracked real estate agents' volume of referrals to lenders not to ensure compliance, but as part of a business assessment.

46.     On January 31, 2017, the mortgage originator Prospect Mortgage entered into a consent judgment with the CPPB where it admitted to violating Section 8 of RESPA.  It admitted that it used co-marketing agreements on a "third party website" to pay real estate agents for referrals.  The website as described in that consent judgment mirrors Zillow's premier agent product and no other website that operated during the relevant time frame.  The consent judgment stated that "[s]ome agents who co-marketed their services on [Zillow] with [Prospect Mortgage] took additional steps to convince consumers to use Prospect loan officers.  For example, one agent told [Prospect Mortgage] that he 'was able to talk [a particular customer] into using you guys for the financing of his purchase."

**Zillow's Co-Marketing Program Does Not Fall Within the RESPA Safe Harbor**

47.     Zillow's does not fall under the RESPA safe harbor because it permitted lenders to pay a greater share of the marketing budget than is justified by the number of leads provided by the program.  Because a lender only receives 4 leads for every 10 received by the broker, if a single lender paid 50% of the agent's advertising cost, the lender is paying 2.5 times more per lead than the agent does.   If, as was permitted under the program, five lenders in total contributed 18% each to the agent's monthly budget, for a total of 90% of that budget, they would be paying 22.5 times more per lead than the agent.

48.     The co-marketing program also does not fall within the safe harbor because Zillow's co-marketing pricing is drastically more expensive for lenders than comparable product offerings by Zillow.  Premiere Agent ads are priced according to impression.  According to eCommission, a service that provides cash advances on commissions to real estate agents, in or around July of 2016 the pricing of Zillow's premiere agent program translated to approximately $30 per lead.  https://www.ecommission.com/how-to-use-zillow-to-generate-more-sales-leads/.  This refers to the cost without co-marketing for an agent.  A lender who participated in the co-marketing program at 50% would therefore pay $37.50 per lead, based on the statistic cited above that lenders received 4 leads for every 10 that the agent received.[3]  On the other hand, during that same time period Zillow charged no more than $2.38 per lead for lenders who purchased advertising without using co-marketing.  In addition to co-marketing, Zillow sold lenders leads through the "Long Form" and "Custom Quote" programs where customers request lending information, provide their contact information, and lenders purchase the leads on a price-per-lead basis.  According to Zillow's 2016 10-K, Zillow received 29.9 million requests for information that it then sold to lenders.  Zillow reported that the revenue for this mortgage advertising was $71,133,000.  Note that this figure also includes other revenue from Zillow's Mortech product,

---

[3]  The arithmetic is as follows:  50% of $30 per lead is $15.0 per lead to the agent.  If a lender gets 40% as many leads as an agent does for the $15 per lead price, the lender is paying $37.50 per lead.

so the cost per lead is actually lower than the $2.38 figure.  Therefore, the co-marketing program's price to lenders far exceeds the fair market price for comparable advertising services where referrals do not occur, and is not sold at a fair market value.  The use of price per leads is an appropriate bench mark because that is the metric that is discussed throughout Zillow's marketing to both lenders and agents.  While it is true that a Premier Agent co-marketing listing also makes a lender's phone number available to a prospective real estate purchaser on the listing, that fact is never stressed in Zillow's advertising to lenders or agents as a driver of value for lenders.

49.    In addition, the co-marketing program cannot fall within the safe harbor because the pricing formula for lenders is based on a totally different metric than the pricing formula Zillow employs to price other lender advertising products, and therefore bears no rational relationship to the market value of the marketing service provided.  The Long Form and Custom Quote programs are priced based on a prospective customer's credit rating, loan amount, and loan type.  Premier Agent advertising, by contrast, is priced based on the demand in a particular zip code.  The safe harbor is inapplicable, therefore, not only because the co-marketing advertisements are overpriced, but because the pricing scheme does not bear any relationship to those that are used to determine prices for non-referral based advertising purchased by lenders.

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

50.     Lenders were also able to evade the 50% cap on their payments to agents that was in place.  According to the Consolidated Complaint in *Boehler v Zillow*, 14-CV-01844-DOC (N.D. Cal, June 22, 2015), James Friedrich, an inside sales consultant discovered a violation of RESPA Section 8 by a lender using the co-marketing program on October 23, 3013.  Specifically, Friedrich discovered that a single lender's credit card was being used to pay more than 50% of the cost of an agent's advertising in the co-marketing program.  Emails exchanged in discovery in that action and subsequently filed in court reveal that this was achieved by billing both the lender and agent's portion of co-marketing costs to one credit card – that of the lender.  Friedrich called a meeting with his manager on October 28, 2013, and explained this and other legal violations he discovered.  He received assurances that this would be addressed, but after several weeks he noticed the problems had not been fixed.  Friedrich informed his manager of this repeatedly, and eventually the manager became angry and told Friedrich to drop it.

51.     On November 3, 2013, Ashley Boehler, another inside sales representative who Friedrich discussed the issue with, sent an email from an anonymous account to several Zillow Executives, including Rascoff, outlining the misconduct discussed in the previous paragraph.  That email identified four separate instances where a single credit card was supplied both for an agent and a co-marketing lender.  Boehler also directly approached Zillow's upper management, revealing his identity, and reiterating his concerns.  Boehler was

HALL & GEORGE PLLC

1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

assured by Zillow's then-CFO Chad Cohen that his anonymity would be protected. However, both Boehler and Friedrich were fired shortly after identifying Zillow's RESPA violations.

52. AW2 reports that similar misconduct to that identified by Friedrich continued at Zillow during the class period. She explained that while Zillow's official policy forbade any lender from paying more than 50% of an agent's advertising costs, it was nonetheless possible for a lender to make a payment of up to 90% of co-marketing costs through the Zillow website. AW2 explained that she spent two years "training reps to tell agents that lenders should not pay more than 50%, but of course, the [Zillow] sales people would tell the agents that the lender could pay up to 90%." Throughout her tenure at Zillow, AW2 recalls hearing Zillow sales representatives telling real estate agents that lenders could pay up to 90% before calls began recording. When AW2 questioned Zillow's practice of having sales representatives instruct agents to violate RESPA, her superiors told her that the Company has "bigger issues to deal with." Every time she asked Zillow management questions about the Co-Marketing program, she was "reminded to not ask questions."

53. Although Zillow has consistently claimed that its co-marketing program's contribution to revenue is small, this is inaccurate. The co-marketing program, according to both Susquehanna International Group and PAA Research, accounts for approximately 10% of Zillow's revenues. According to Susquehanna,

revenues from co-marketing are highly profitable, with EBITDA margins of 50-80%.  That is, the costs of the co-marketing program are quite low, so the revenues are highly profitable.  Therefore, Patel estimated that a loss of the co-marketing program could lead to a 20-50% decline in Zillow's EBITDA.

**Zillow's Co-Marketing Program Violated the CFPA's Prohibition On Providing Substantial Assistance to Abusive Acts In Connection With Consumer Financial Transactions**

54.    The CFPA provides the CFPB with the authority to take action to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. § 5531(a). Abusive practices are those that, among other things, take "unreasonable advantage of … the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." *Id.* §5531 (d).  Real estate agents and lenders are covered persons, and, as set forth in a HUD 2010 interpretive rule, RESPA's Section 8 exists precisely because "a real estate broker and agent hold positions of influence in the real estate transaction."  Therefore, "a homebuyer or seller is more likely to accept the broker's or agent's promotion or recommendation of a settlement service provider." Section 1 of RESPA states that RESPA is needed to protect home buyers from "certain abusive practices that have developed in some areas of the country" and that the purpose of RESPA is to eliminate practices such

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

as "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."   12 U.S.C. §2601. Therefore, violations of RESPA Section 8 for improper referrals are also violations of Section 5531 of the CFPA.

55.     It is a violation of CFPA Section 5536 to knowingly or recklessly provides substantial assistance to a violator of Section 5531.  Zillow substantially assisted lenders and agents who violated RESPA Section 8, and therefore CFPA Section 5531, by making illegal payments for referrals through the co-marketing programs.  Zillow was aware of or reckless towards the program because, as explained by AW2 in paragraph 43 above, Zillow actively tracked the number of referrals premiere agents provided to lenders.  Zillow was also aware that the co-marketing program was not subject to the safe harbor because, as set forth in paragraphs 47-53 above, it had data that showed that agents paid far in excess of reasonable market rates for co-marketing advertising.

**The CFPB Steps Up Regulatory Enforcement and Targets Zillow**

56.     In 2015, the CFPB dramatically stepped up RESPA enforcement, entering into several enforcement actions and consent orders with various players in the real estate industry.  For instance, the CFPB entered into a consent order with Wells Fargo and JP Morgan Chase for a total of $35.7 million in fines and redress to consumers, in response to those two banks steering business to Genuine Title, a defunct title company, in exchange for Genuine Title purchasing, analyzing, and providing data on customers, and creating letters with the banks'

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

logos that Genuine Title then mailed to prospective borrowers.  It reached a settlement for $2 million with New Day Financial for using deceptive advertising and paying kickbacks to a veteran's organization in exchange for referrals.  At the same time, the CFPB issued a decision on June 4, 2015, levying a $109 million disgorgement order against PHH Corporation, a title insurance company, finding that it illegally referred customers to mortgage insurers in exchange for kickbacks.

57.     Zillow management and investors were keenly aware of the CFPB's heightened enforcement efforts.

58.     As a result of this stepped up regulatory activity, an analyst n a November 3, 2015 investor call asked Defendants Rascoff and Phillips "can you just give us a sense for how much the mortgage co-advertising is contributing to agent revenue? And kind of where penetration is? Where you think it can go? And is the RESPA or CFPB kind of investigations into this is – is this something that should be a concern? Or something that you think is not really an issue?"  Phillips responded by stating "on your questions about co-marketing, co-marketing with lenders and agents is a very small part of our business, a small contributor to ARPA[4] revenue. Importantly though, we are not seeing lenders depart from this program notwithstanding all of the discussions in the marketplace about the CFPB and the CFPB's recent pronouncements and actions. I can assure you that we work

---

[4] ARPA refers to "average revenue per account" – that is, the average amount of revenue generated for each customer account.

HALL & GEORGE PLLC

1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

diligently to comply with all of the rules put forth by government agencies and of course, we monitor the CFPB and the things that they are saying and doing to make sure that we remain in compliance and to make sure that we understand how their activities relate to our business."

59.     In that conference call, Zillow failed to mention that it received a subpoena from the CFPB, dated April 1, 2015, according to the CFPB Document Submission Standards provided to Plaintiffs in response to a FOIA request, in connection with an investigation by the CFPB into potential violations of RESPA related to Zillow's co-marketing program.

60.     In the beginning of 2017, in response to the CFPB's inquiries, Zillow substantially altered their co-marketing program.  Instead of allowing lenders to collectively contribute up to 90% of an agent's advertising spend, Zillow restricted lenders to 50% of that spend.  However, they concealed this change from the public and did not even alter their own website to reflect the change for several months.  According to AW1, in the beginning of 2017 she and other sales representatives were instructed to explain to agents that Zillow was capping total lender contributions at 50% of total advertising costs.  Her understanding was that this change was in response to a government investigation.  AW1 noted that because this decrease in the maximum amount a lender could pay to an agent for co-marketing costs was not reflected on Zillow's website, it was difficult to explain to customers because the information on that website was different than what

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

AW1 was providing to agents.  A review of archive.org confirms the fact that, as of March 23, 2017, Zillow had not changed its website to reflect this new policy capping lender payments to agents.  In addition, analysts discussing Zillow's co-marketing program were unaware of the change, describing the old version of the co-marketing program in their reports.  For instance, the prominent real estate website The Real Deal described the outdated program on August 18, 2017 in an article titled "'Co-marketing' arrangements put Zillow in hot water." Housingwire.com, another prominent real estate industry publication, referred to Zillow's 90% limit on September 13, 2017, not noting that this was an out of date version of the program.

61.     Zillow received a Notice and Opportunity to Respond ("NORA")[5] letter from the CFPB in February of 2017, stating that the CFPB Office of Enforcement was considering whether to recommend that the CFPB take legal action against Zillow for violation of Section 8 of RESPA, and Section 1036 of the Consumer Financial Protection Act.  Zillow responded in March of 2017 and in April of 2017 Zillow received an additional Civil Investigative Demand.  Finally, in August 2017 the CFPB informed Zillow that it had concluded its investigation, invited Zillow to discuss a possible settlement, and that it intended to pursue an action against Zillow if a settlement was not reached.

---

[5] A NORA letter is a letter from the CFPB indicating that the CFPB's Office of Enforcement is considering whether or not to recommend that legal action is appropriate and inviting the potential target of that action the opportunity to state why legal action is not appropriate.

**Materially False and Misleading Statements Issued during the Class Period**

62.     The Class Period begins on November 17, 2014 when Zillow's Initial Registration Statement became effective. The Initial Registration Statement was signed by Defendants Rascoff and Phillips.

63.     The Initial Registration Statement incorporated by reference Zillow, Inc.'s annual report for the year ending December 31, 2013 filed on Form 10-K with the SEC on February 18, 2014 (the "2013 10-K"). The 2013 10-K, and therefore by reference the Initial Registration Statement, stated the following regarding the Company's adherence to government regulations:

**Government Regulation**

[T]he real estate agents, mortgage brokers, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. While we do not believe that we are currently subject to these regulations, ***we intend to ensure that any content created by Zillow is consistent with them by obtaining assurances of compliance from our advertisers and customers for their activities through, and the content they provide on, our mobile applications and websites***. Since the laws and regulations governing real estate, rentals and mortgages are constantly evolving, it is possible that some part of our business activities could fall within the scope of regulation or be prohibited altogether at some point in the future.

(Emphasis added).

64.     The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and

lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services. The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money. The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

65.    The Initial Registration Statement also included the merger agreement between Zillow, Inc. and Trulia. This included a section entitled "Representations and Warranties of Zillow." It stated that "[n]either Zillow nor any Zillow Subsidiary is in conflict with, or in default, breach or violation of, (a) any Law applicable to Zillow or any Zillow Subsidiary… ."

66.    The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services. The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

making personal referrals of customers to the lenders in exchange for money, in violation of RESPA.  The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

67.     On February 17, 2015, Zillow, Inc. filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 ("2013 10-K"). The 2015 10-K was signed by Defendant Rascoff.

68.     The 2014 10-K stated the following regarding the Company's adherence to government regulations:

> [T]he real estate agents, mortgage brokers, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. We endeavor to ensure that any content created by Zillow is consistent with such laws and regulations by obtaining assurances of compliance from our advertisers and consumers for their activities through, and the content they provide on, our mobile applications and websites. Since the laws and regulations governing real estate, rentals and mortgages are constantly evolving, it is possible that some part of our business activities could fall within the scope of regulation or be prohibited altogether at some point in the future.

69.     The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services.  The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA.  The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

70.     On February 17, 2015, Zillow filed a Form S-8 Registration Statement with the SEC (the "February 2015 S-8"), which registered securities offered to employees pursuant to the amended and restated incentive plan dating to 2011 (the "2011 Incentive Plan"). The February 2015 S-8 was signed by Defendant Rascoff. The February 2015 S-8 was false and misleading as it incorporated the 2014 10-K by reference which was misleading as set forth in paragraph 69.

71.     On April 1, 2015, Zillow filed a Form S-3 Post-Effective Amendment to the Initial Registration Statement with the SEC (the "Form S-3"). The form S-3 was signed by Defendant Rascoff. The Form S-3 registered 124,716 shares of Class A Common Stock. The Form S-3 was false and misleading as it incorporated the 2014 10-K by reference which was misleading as set forth in paragraph 69.

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154  206.292.5900

72.     On August 17, 2015, Zillow filed a Form S-8 Registration Statement with the SEC (the "August 17, 2015 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan. The August 17, 2015 S-8 was signed by Defendants Rascoff and Phillips. The August 17, 2015 S-8 was false and misleading as it incorporated the 2014 10-K by reference which was misleading as set forth in paragraph 69.

73.     On August 21, 2015, Zillow filed a Form S-8 Registration Statement with the SEC (the "August 21, 2015 S-8"), which amended and restated the 2011 Incentive Plan by amending the securities to be offered to employees in employee benefit plans. The August 21, 2015 S-8 was signed by Defendants Rascoff and Phillips. The August 21, 2015 S-8 was false and misleading as it incorporated the 2014 10-K by reference which was misleading as set forth in paragraph 66.

74.     On November 3, 2015, on a call with investors, an analyst asked "can you just give us a sense for how much the mortgage co-advertising is contributing to agent revenue? And kind of where penetration is? Where you think it can go? And is the RESPA or CFPB kind of investigations into this is – is this something that should be a concern? Or something that you think is not really an issue?" Phillips responded by stating that "co-marketing with lenders and agents is a very small part of our business, a small contributor to ARPA revenue. Importantly though, we are not seeing lenders depart from this program notwithstanding all of the discussions in the marketplace about the CFPB and the CFPB's recent

pronouncements and actions. I can assure you that we work diligently to comply with all of the rules put forth by government agencies and of course, we monitor the CFPB and the things that they are saying and doing to make sure that we remain in compliance and to make sure that we understand how their activities relate to our business."

75.     The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services.  The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA.  The foregoing statement was also misleading for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA.  The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

76.     On February 12, 2016, Zillow filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the

quarter and year ended December 31, 2015 ("2015 10-K"). The 2015 10-K was signed by Defendants Rascoff and Phillips.

77.    The 2015 10-K stated the following regarding the Company's adherence to government regulations:

**Government Regulation**

… [T]he real estate agents, mortgage professionals, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. *We endeavor to ensure that any content created by Zillow is consistent with such laws and regulations by obtaining assurances of compliance from our advertisers and consumers for their activities through, and the content they provide on, our mobile applications and websites.*

(Emphasis added).

78.    The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services.  The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA.  The foregoing statement was also misleading for failing to

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA. The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

79.     On March 4, 2016, Zillow filed a Form S-8 Registration Statement with the SEC (the "March 2016 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan. The March 2016 S-8 was signed by Defendants Rascoff and Phillips. The March 2016 S-8 was false and misleading as it incorporated the 2015 10-K by reference which was misleading as set forth in paragraph 78.

80.     On August 5, 2016, Zillow filed a Form S-8 Registration Statement with the SEC (the "August 2016 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan. The August 2016 S-8 was signed by Defendants Rascoff and Phillips. The August 2016 S-8 was false and misleading as it incorporated the 2015 10-K by reference which was misleading as set forth in paragraph 78.

81.     On February 2, 2017, Zillow filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 ("2016 10-K"). The 2016 10-K was signed by Defendants Rascoff and Phillips.

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

82.     The 2016 10-K stated the following regarding the Company's adherence to government regulations:

**Government Regulation**

… [T]he real estate agents, mortgage professionals, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. *We endeavor to ensure that any content created by Zillow is consistent with such laws and regulations by obtaining assurances of compliance from our advertisers and consumers for their activities through, and the content they provide on, our mobile applications and websites*.

(Emphasis added).

83.     The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services.  The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA.  The foregoing statement was also misleading for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA.  The foregoing

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

84.    During a conference call with analysts that same day, Phillips provided further detail, stating that the CFPB has been reviewing the co-marketing program for compliance with RESPA, that the CFPB provided more information, and that "we believe our co-marketing program has, and continues to, allow agents and lenders to comply with the law while using our product." An analyst on that call asked about the amount of business done through co-marketing type arrangements, and whether there had been any changes in behavior by agents or lenders given the CFPB's actions.  "On the CFPB, we don't break out the amount of the revenue that comes from co-marketing efforts, but we have said and it continues to be the case that it's a small portion of overall revenue. In terms of changes in behavior, we haven't observed anything specific, but I can tell you that real estate agents and lenders are pretty keenly aware of the restrictions that are placed upon their co-marketing efforts through RESPA and other regulatory regimes. So they are intent on complying and pay close attention to their own behavior, monitoring themselves. We think though the way that we have put this product together enabled agents and lenders to participate in full compliance with the law."

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

85.     The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services.  The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA.  The foregoing statement was also misleading for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA.  In addition, the statements "we believe our co-marketing program has, and continues to, allow agents and lenders to comply with the law while using our product" and "[w]e think though the way that we have put this product together enabled agents and lenders to participate in full compliance with the law" are misleading for failing to disclose that Zillow had already altered the co-marketing program in an attempt to remedy RESPA violations the CFPB had already identified to Zillow. The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

86.     On February 10, 2017, Zillow filed a Form S-8 Registration Statement with the SEC (the "February 2017 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan. The February 2017 S-8 was signed by Defendants Rascoff and Phillips. The February 2017 S-8 was false and misleading as it incorporated the 2016 10-K by reference which was misleading as set forth in paragraph 83.

87.     On May 24, 2017, Rascoff appeared on the internet-based television channel Cheddar.com, and stated "two years ago the CFPB started asking us questions about this [the co-marketing program] and we've been talking with them literally for two years.  We think the way we've constructed the program is completely compliant and allows agents and lenders to stay within the confines of the laws that govern this, but we're still talking to the CFPB about it so we'll see.  We haven't disclosed the amount of revenue, we've said it's small, but we haven't disclosed it, and, you know, it's an ongoing conversation."  He was then asked "if it's a case where you had to alter the co-marketing program how much of an impact would it be on the company".  Rascoff responded that "… its really hard to speculate hypothetically because we have no idea whether this ends up being blessed or not.  It could have no impact or it could have an impact."

88.     The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations.

Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services.  The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA.  The foregoing statement was also misleading for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA.  In addition, the statement "the way we've constructed the program is completely compliant" is misleading because, in reality, Zillow had already altered the co-marketing program in an attempt to remedy RESPA violations identified by the CFPB.  The statement "… its really hard to speculate hypothetically because we have no idea whether [the co-marketing program] ends up being blessed or not" is misleading for failing to disclose that Zillow had already altered the co-marketing program in an attempt to remedy RESPA violations identified by the CFPB.    The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

**The Truth Emerges**

89.    On May 4, 2017, in a 10-Q quarterly report, Zillow revealed that it had received a Civil Investigative Demand from the CFPB in 2015.  Zillow also

HALL & GEORGE PLLC

1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

disclosed that it received a Notice and Opportunity to Respond ("NORA") letter from the CFPB in February of 2017, stating that the CFPB Office of Enforcement was considering whether to recommend that the CFPB take legal action against Zillow for violation of Section 8 of RESPA, and Section 1036 of the Consumer Financial Protection Act, that Zillow responded on March of 2017, and that in April of 2017 Zillow received an additional Civil Investigative Demand.

90.     During a conference call that same day with investors, Phillips provided further detail, stating that the CFPB has been reviewing the co-marketing program for compliance with RESPA, that the CFPB provided more information, and that "we believe our co-marketing program has, and continues to, allow agents and lenders to comply with the law while using our product." An analyst on that call asked about the amount of business done through co-marketing type arrangements, and whether there had been any changes in behavior by agents or lenders given the CFPB's actions.  "On the CFPB, we don't break out the amount of the revenue that comes from co-marketing efforts, but we have said and it continues to be the case that it's a small portion of overall revenue. In terms of changes in behavior, we haven't observed anything specific, but I can tell you that real estate agents and lenders are pretty keenly aware of the restrictions that are placed upon their co-marketing efforts through RESPA and other regulatory regimes. So they are intent on complying and pay close attention to their own behavior, monitoring themselves. We think though the way that we

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

have put this product together enabled agents and lenders to participate in full compliance with the law." Because of Phillips' false assurance that the co-marketing program accounted for a "small" amount of revenue, that no changes had been made and that its co-marketing program currently and in the past complied with the law, the market did not react to the revelation of the investigation.

91.     The market instead learned the true scope of the co-marketing program on May 17, 2017 when Shyim Patel, of Susquahana Financial Group, released a sensitivity analysis of the potential for an adverse CFPB ruling to negatively impact Zillow's revenue and income. That research indicated that in excess of 10% of Zillow's revenue was exposed to illegal co-marketing, and that revenues from co-marketing are highly profitable, with EBITDA margins of 50-80%, as compared to the rest of Zillow's business, which operated at a loss throughout the class period. That is, the costs of the co-marketing program are quite low, so the revenues are highly profitable. Therefore, Patel estimated that a loss of the co-marketing program could lead to a 20-50% decline in Zillow's 2018 EBITDA. This corrected Zillow's misstatement that the marketing program was small and therefore did not pose any threat to Zillow's revenue, income or business prospects.

92.     On this news, Zillow's Class A share price dropped $2.46 to $41.64, a drop of 6.24%. Zillow's Class C share price dropped $3.02 to $41.37, a drop of

6.80%. Susquehanna's report received widespread coverage, with articles summarizing those findings on www.seekingalpha.com and www.streetinsider.com.

93.     On August 8, 2017, the Company filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2017, stating in relevant part:

> In April 2017, we received a Civil Investigative Demand from the Consumer Financial Protection Bureau ("CFPB") requesting information related to our March 2017 response to the CFPB's February 2017 Notice and Opportunity to Respond and Advise ("NORA") letter. The NORA letter notified us that the CFPB's Office of Enforcement was considering whether to recommend that the CFPB take legal action against us, alleging that we violated Section 8 of the Real Estate Settlement Procedures Act ("RESPA") and Section 1036 of the Consumer Financial Protection Act ("CFPA"). This notice stemmed from an inquiry that commenced in 2015 when we received and responded to an initial Civil Investigative Demand from the CFPB. We continue to cooperate with the CFPB in connection with requests for information. Based on correspondence from the CFPB in August 2017, we understand that it has concluded its investigation. The CFPB has invited us to discuss a possible settlement and indicated that it intends to pursue further action if those discussions do not result in a settlement. We continue to believe that our acts and practices are lawful and that our comarketing program allows lenders and agents to comply with RESPA, and we will vigorously defend against any allegations to the contrary. Should the CFPB commence an action against us, it may seek restitution, disgorgement, civil monetary penalties, injunctive relief or other corrective action. We cannot provide assurance that the CFPB will not commence a legal action against us in this matter, nor are we

able to predict the likely outcome of any such action. We have not recorded an accrual related to this matter as of June 30, 2017 or December 31, 2016. There is a reasonable possibility that a loss may be incurred; however, the possible loss or range of loss is not estimable.

94.     Following the news that the CFPB had determined that the co-marketing program had violated the law, and that the CFPB intended to seek remedial action  against Zillow, its Class A share price fell $7.49, or 15.7%, on the following two days to close at $40.25 on August 10, 2017. Zillow's Class C share price fell $7.43, or 15.5%, on the following two trading days to close at $40.50 on August 10, 2017.

95.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER**

**Additional Allegations Concerning Rascoff's Scienter**

96.     Rascoff's scienter can be inferred from his participation in investor conference calls where Defendants made false exculpatory statements, and his thorough preparations for those conference calls.  Specifically, Rascoff was on the conference call when Phillips falsely stated that "we believe our co-marketing program has, and continues to, allow agents and lenders to comply with the law while using our product" and that "[w]e think though the way that we have put

this product together enabled agents and lenders to participate in full compliance with the law."   As Rascoff himself has explained, in an article posted on linkedin.com on November 30, 2017, he and Phillips thoroughly prepare for investor conference calls in such a way that these statements could not have been innocently made.   First, a member of Rascoff's team emails different Zillow departments whose products are discussed in his and Phillips' prepared remarks. Rascoff is cc'd on those emails, and personally directs that the emails be sent. Therefore, members of the co-marketing team would have seen the claim that the co-marketing program has and continues to comply with the law, and would have known, and informed Rascoff, that in fact the program violated RESPA and was changed in the beginning of 2017 in an attempt to bring the program into compliance.  Second, Rascoff further prepares for the investor conference call for a full 2-3 days with a 5-10 person team, and spends an additional 1-2 days following up.  The 5-10 person team monitors the call in real time and reviews the call for any necessary follow up, including corrections.

97.    Rascoff's scienter can be inferred from the fact that he received notice, prior to the beginning of the class period, that the co-marketing program was used to evade RESPA.  Boehler alerted Zillow executives that Zillow lenders were paying more than 50% of co-marketing costs by providing their own credit cards to be charged for the broker's portion.  In a motion to compel the deposition of Rascoff, Boehler's counsel specifically represented that the email was sent to

Rascoff, a fact that the defendants in that action did not deny.  Zillow later attached a copy of that email as an exhibit to a discovery motion.  In that email, Boehler specifically stated that this conduct was a RESPA violation.

98.     Rascoff's scienter can further be inferred from his repeated misleading statements during the May 24 interview with cheddar.com, in which he stated 1) that the co-marketing program is small; 2) that the co-marketing program is "completely compliant"; and 3) that it's hard to speculate on whether there would be an alteration to the program because the program might be "blessed" by the CFPB.  These statements are false because the co-marketing program is not small, and had in fact already been altered by the company because of the CFPB's expressed concern that it was non-compliant.

**Additional Allegations Supporting Phillips' Scienter**

99.     Phillips' scienter can be inferred from her participation in investor conference calls where she made false exculpatory statements, and her thorough preparations for those conference calls.  Specifically, Phillips falsely stated that "we believe our co-marketing program has, and continues to, allow agents and lenders to comply with the law while using our product" and that "[w]e think though the way that we have put this product together enabled agents and lenders to participate in full compliance with the law."  As Rascoff has explained, in an article posted on linkedin.com on November 30, 2017, he and Phillips thoroughly prepare for investor conference calls in such a way that these statements could not

have been innocently made.  First, a member of Rascoff's team emails different Zillow departments whose products are discussed in his and Phillips' prepared remarks.  Rascoff is cc'd on those emails, and personally directs that the emails be sent.  Therefore, members of the co-marketing team would have seen the claim that the co-marketing program has and continues to comply with the law, and would have known, and informed Phillips, that in fact the program was changed in the beginning of 2017 in an attempt to bring the program into compliance. Second, Phillips further prepares for the investor conference call for a full 2-3 days with a 5-10 person team, and spends an additional 1-2 days following up.  The 5-10 person team monitors the call in real time and reviews the call for any necessary follow up, including corrections.

100.    Phillips' scienter can further be inferred from her dual position as CFO and Chief Legal Officer.  In her capacity as Chief Legal Officer, she had authority for overseeing investigations such as the CFPB investigation, and therefore was aware of its pendency and the CFPB's concerns.  In addition, she was responsible for conducting due diligence on the merger with Trulia with respect to legal matters, and therefore was responsible for ensuring the truth of Zillow, Inc's representation that none of Zillow's operations were in breach or violation of any applicable laws.  See ¶53 above.  According to Rascoff, Phillips ran mergers and acquisitions for Zillow, and "played a pivotal role in … the

company's acquisitions, including Trulia . . . .  Most recently Phillips oversaw the entire Trulia Acquisition process."

101.    Phillips' role in performing due diligence with respect to the Trulia Acquisition and the preparation of the representations and warranties would have caused her to pay close attention to the legality of the co-marketing program, according to William Purcell, an expert in M&A due diligence retained by the Plaintiff.

102.    Mr. Purcell has been an investment banker for approximately 50 years, having spent 25 years at Dillon, Read & Co., Inc. and participated in over 100 merger and acquisition transactions, including over 20 Special Committees of Boards of Directors.  He has acted as an expert witness since 1976 and has been an expert or consultant in over 180 litigations, many of which have involved the M&A due diligence process and M&A related representations and warranties. Mr. Purcell has been retained as an expert by the SEC, DOJ, and the IRS.

103.    Mr. Purcell explains that during an M&A transaction, Zillow, as the acquirer, had the obligation to validate the accuracy of the representations and warranties made to the seller (Trulia) in the merger agreement. Proper due diligence is meant to be a thorough process involving affirmatively verifying information, acting as one's own devil's advocate, and following up on any red flag issues that are uncovered.   Affirmative verification of the accuracy of representations and warranties included in a merger agreement is highly

important in any M&A due diligence process.  Such representations are heavily negotiated and considered to be very important to both parties.  It would be incumbent upon Phillips as both Chief Financial Officer and Chief Legal Officer to ensure the accuracy of their representations and warranties, including Zillow's representation that "[n]either Zillow nor any Zillow Subsidiary is in conflict with, or in default, breach or violation, of (a) any Law applicable to Zillow or any Zillow Subsidiary." In ensuring the accuracy of these representations, Phillips would have conferred closely with compliance personnel and department heads in analyzing Zillow's compliance with, and legal exposure to, any rules, regulations and laws, including RESPA. In doing so, Phillips would have definitely learned that Zillow's co-marketing program violated RESPA.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired Zillow securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

105.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Zillow securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Zillow or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

106.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

107.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

108.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

- whether statements or omissions made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Zillow;

- whether the Individual Defendants caused Zillow to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Zillow securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

109.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

110.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Zillow securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period; on average during the class period, 4,680,791 shares of Zillow Class A stock traded weekly, or 10 percent of the float, and during the portion of the class period where Class C shares were available, those shares traded with an average weekly volume of 7,014,400, or 7 percent of the float;

- the Company traded on the NASDAQ and 135 market makers made a market in Zillow's stock;

- the Company was covered by at least 17 analysts during the Class Period;

- Zillow was eligible to file and did file a Registration Statement under Form S-3;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Zillow securities between the time the defendants failed to

disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

111.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

112.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

113.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

114.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

115.    During the Class Period, defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which

operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Zillow securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Zillow securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

116.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Zillow securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Zillow's finances and business prospects.

117.   By virtue of their positions at Zillow, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

118.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Zillow, the Individual Defendants had knowledge of the details of Zillow's internal affairs.

119.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Zillow. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Zillow's businesses, operations, future financial condition and future prospects. As a result of the

dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Zillow securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Zillow's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Zillow securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

120.    During the Class Period, Zillow securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Zillow securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Zillow securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Zillow securities declined sharply upon

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

1  public disclosure of the facts alleged herein to the injury of Plaintiffs and Class

2  members.

3   121.   By reason of the conduct alleged herein, Defendants knowingly or

4

5  recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act

6  and Rule 10b-5 promulgated thereunder.

7   122.   As a direct and proximate result of Defendants' wrongful conduct,

8
   Plaintiffs and the other members of the Class suffered damages in connection with
9

10  their respective purchases, acquisitions and sales of the Company's securities

11  during the Class Period, upon the disclosure that the Company had been

12  disseminating misrepresented financial statements to the investing public.

13                              **COUNT II**

14
                   **Violations of Section 20(a) of the Exchange Act**
15                 **(Against the Individual Defendants)**

16   123.   Plaintiffs repeat and reallege each and every allegation contained in

17
   the foregoing paragraphs as if fully set forth herein.
18

19   124.   During the Class Period, the Individual Defendants participated in

20  the operation and management of Zillow, and conducted and participated,

21  directly and indirectly, in the conduct of Zillow' business affairs. Because of their

22
   senior positions, they knew the adverse non-public information about Zillow's
23

24  misstatement of income and expenses and false financial statements.

25

26

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

125.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Zillow's financial condition and results of operations, and to correct promptly any public statements issued by Zillow which had become materially false or misleading.

126.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Zillow disseminated in the marketplace during the Class Period concerning Zillow's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Zillow to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Zillow within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Zillow securities.

127.   Each of the Individual Defendants, therefore, acted as a controlling person of Zillow. By reason of their senior management positions and/or being directors of Zillow, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Zillow to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Zillow and possessed the power to control

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

128.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Zillow.

**REQUEST FOR RELIEF**

Plaintiffs request judgment against Defendants as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts, omissions, and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury in this action of all issues so triable.

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

1    DATED this 16th day of November, 2018.

2                                          **HALL & GEORGE** PLLC

3
                                           By: /s/ Colin M. George
4                                          Spencer Hall, WSBA No. 6162
                                           E-mail: shall@hallgeorge.com
5                                          Colin M. George, WSBA No. 45131
                                           E-mail: cgeorge@hallgeorge.com
6                                          1001 Fourth Avenue, Suite 3900
7                                          Seattle, WA 98154
                                           Telephone: (206) 292-5900
8                                          Facsimile: (206) 292-5901

9
                                           *Local Counsel for Lead Plaintiffs*
10

11                                         **THE ROSEN LAW FIRM, P.A.**

12                                         By: /s/ Laurence M. Rosen
                                           Laurence M. Rosen, Esq. (*pro hac vice*)
13                                         Email: lrosen@rosenlegal.com
                                           Jonathan Stern, Esq. (*pro hac vice*)
14                                         Email: jstern@rosenlegal.com
                                           275 Madison Avenue, 34th Floor
15                                         New York, NY 10016
16                                         Telephone: (212) 686-1060
                                           Facsimile: (212) 202-3827
17

18                                         *Lead Counsel for Lead Plaintiffs*

19

20

21

22

23

24

25

26

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900

1

**CERTIFICATE OF SERVICE**

2

     I, COLIN M. GEORGE, hereby declare under penalty of perjury as follows:

3

     1.     I am an attorney at Hall & George PLLC. I am over the age of

4

5

eighteen.

6

     2.     On November 16, 2018, I electronically filed the Second Amended

7

Consolidated Complaint with the Clerk of the Court using the CM/ECF system

8

which sent notification of such filing to counsel of record.

9

     DATED this 16th day of November, 2018.

10

11

12

13

/s/     Colin M. George

14

     Colin M. George

15

16

17

18

19

20

21

22

23

24

25

26

HALL & GEORGE PLLC

1001 Fourth Avenue, Suite 3900, Seattle, WA 98154   206.292.5900