UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| In re Zillow Group, Inc.<br>Securities Litigation | CASE NO. C17-1387-JCC<br><br>ORDER |

This matter comes before the Court on Defendants' motion to dismiss the second consolidated amended complaint (hereinafter "second amended complaint") (Dkt. No. 50). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES Defendants' motion for the reasons explained herein.

## I. BACKGROUND

The Court has provided a detailed description of this case in a prior order, which it will refer to as relevant to this motion. (*See* Dkt. No. 46.) Plaintiffs filed this putative class action against Zillow Group, Inc., ("Zillow") on behalf of purchasers of Zillow securities,[1] alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act")

---

[1]The alleged class includes all persons, excluding Defendants, who acquired or purchased Zillow securities from November 17, 2014 to August 8, 2017. (Dkt. No. 47 at 2.)

and violation of the Securities and Exchange Commission Rule 10b–5.[2] (*Id*. at 1–2.) Plaintiffs also name as defendants Spencer Rascoff and Kathleen Phillips (collectively with Zillow, "Defendants"), who were Zillow's Chief Executive Officer and Chief Financial Officer/Chief Legal Officer respectively, during the relevant class period. (*Id*. at 2.)

The thrust of Plaintiffs' claims is that Zillow's "co-marketing program" was designed to allow participating real estate agents to refer mortgage business to participating lenders in violation of Section 8(a) of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, 2607. (*Id*. at 8.) Plaintiffs assert that Defendants made a series of misleading statements regarding Zillow's legal compliance by failing to disclose the co-marketing program's alleged illegality, particularly after the Consumer Financial Protection Bureau ("CFPB") launched an investigation into the program. (*Id*.) Plaintiffs allege that Defendants' misrepresentations about Zillow's legal compliance caused them to purchase the company's stock at artificially inflated prices. (*Id*. at 4.)

Defendants moved to dismiss Plaintiffs' consolidated amended complaint (Dkt. No. 35) for failure to state a claim upon which relief can be granted. (Dkt. No. 36.) On October 2, 2018, the Court granted Defendants' motion, and dismissed Plaintiffs' Exchange Act claims without prejudice and with leave to amend. (Dkt. No. 46.) In its order, the Court wrote:

> [I]f Plaintiffs choose to file a second amended complaint, they must assert particularized facts that demonstrate that Zillow designed the co-marketing program to violate RESPA, and that Zillow was instructing and encouraging third-parties to commit such violations. Plaintiffs must additionally allege with particularity that Defendants made material false or misleading statements regarding the co-marketing program's compliance with RESPA, that Defendants' statements evinced a strong inference of scienter, and that such statements caused the loss alleged by Plaintiffs.

(*Id*. at 32.) On November 16, 2018, Plaintiffs timely filed their second amended complaint. (Dkt. No. 47.) Plaintiffs again allege that the co-marketing program was designed to violate RESPA

---

[2] The Court previously dismissed Plaintiffs' claims under the Securities Act of 1933 without leave to amend. (Dkt. No. 46 at 2.)

and Defendants made false statements regarding Zillow's legal compliance. (*Id*. at 3–5.) Plaintiffs also allege, for the first time, that Defendants violated the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5336, by providing "substantial assistance" to co-marketing participants who were violating RESPA. (*Id*. at 24–26.) Plaintiffs assert that these alleged CFPA violations provide a separate basis for the Court to conclude that Defendants made misleading statements. (*Id*. at 35–40.)

On December 17, 2018, Defendants filed a motion to dismiss the second amended complaint for failure to state a claim upon which relief can be granted. (Dkt. No. 50.) Defendants assert that Plaintiffs have failed to correct the deficiencies identified by the Court in its prior order dismissing the amended complaint—specifically, that Plaintiffs have failed to allege "particularized facts demonstrating that Zillow designed its business to violate the law, encouraged third parties to violate the law, made false or misleading statements about the Company's compliance with the law, and caused the losses alleged." (*Id*. at 6.)

## II.   DISCUSSION

### A.   Legal Standard for Motion to Dismiss Securities Fraud Claim

To state a claim for securities fraud under Section 10(b) and Rule 10b–5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)).

Normally, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). Complaints alleging securities fraud claims under Section 10(b) and Rule 10b–5 must additionally satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *WPP Luxembourg*

*Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1047 (9th Cir. 2011) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)). Rule 9(b) requires that complaints alleging fraud or mistake must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This standard requires that a complaint allege the "who, what, when, where, and how" of the fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

Pursuant to the PSLRA, a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). While the facts supporting a securities fraud claim must be stated with particularity, the Court must accept as true all well-pleaded allegations and draw all reasonable inferences from those allegations in the light most favorable to the plaintiff. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018).

### B. Plaintiffs' Exchange Act Claims

Before the Court can analyze the statements that Plaintiffs allege were materially misleading, it must first assess Plaintiffs' allegations regarding Zillow's RESPA and CFPA violations. If the second amended complaint lacks particularized facts regarding these alleged violations, then many of Defendants' statements could neither have been misleading nor made with the requisite scienter. *See* 15 U.S.C. § 78u-4(b)(1)–(2) (stating that plaintiffs must allege with specificity "the reason or reasons why the statement is misleading," and facts "giving rise to a strong inference that the defendant acted with the requisite state of mind."); (*see also* Dkt. No. 46 at 8–16.)

//

1.     <u>RESPA Allegations</u>

RESPA Section 8(a) prohibits giving or accepting "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). "Courts commonly find a violation of § 2607(a) when (1) a payment or thing of value was exchanged, (2) pursuant to an agreement to refer settlement business, and (3) there was an actual referral." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015). "An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct." 12 C.F.R. § 1024.14(e). A referral includes "any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service" such as a mortgage lender. 12 C.F.R. § 1024.14(f)(1).

Notwithstanding the law's prohibition on paying for referrals, RESPA Section 8(c) contains a safe harbor provision that permits "[a] payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c); 12 C.F.R. § 1024.14(g)(iv). The Ninth Circuit has interpreted the safe harbor to apply (1) where "goods or facilities were actually furnished or services were actually performed for the compensation paid" and, (2) "the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed." *Geraci v. Homestreet Bank*, 347 F.3d 749, 751 (9th Cir. 2003); *see also PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 40 (D.C. Cir. 2016) (holding that RESPA's safe harbor prohibits "payments for referrals," but not "bona fide payments for services."). For the safe harbor to apply, the payments in question "must be commensurate with the amount normally charged for similar services in similar transactions in similar markets." *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1011 (9th Cir. 2002).

The Court previously rejected both of Plaintiffs' theories that the co-marketing program violated RESPA Section 8(a). (Dkt. No. 46 at 10–16.) First, the Court ruled that Plaintiffs failed to allege particularized facts demonstrating that Defendants designed the co-marketing program to allow real estate agents to make illegal referrals to lenders in exchange for the lenders paying a portion of the agents' advertising costs to Zillow or that such referrals were occurring. (*Id*. at 10–12.) Second, the Court ruled that Plaintiffs failed to allege particularized facts demonstrating that the co-marketing program was designed to allow participating lenders to pay more than fair market value for the advertising services they received, such that the Court could reasonably infer that the program fell outside RESPA's safe harbor provision. (*Id*. at 12–14.) The second amended complaint includes new allegations regarding both theories of RESPA liability, which the Court examines in turn.

> a.      *Allegations Regarding Illegal Referrals*

Plaintiffs assert that the purpose of the co-marketing program was "to enable lenders to obtain referrals in exchange for payments to [Zillow]." (Dkt. No. 51 at 7.) The second amended complaint alleges that "Zillow designed the program with the understanding that agents would . . . use it to violate RESPA by making illegal referrals to lenders." (Dkt. No. 47 at 4.) Plaintiffs further allege that "Zillow actively monitored and encouraged lenders and agents to violate RESPA, contacting agents to make sure they are making referrals." (*Id*.) In support of these allegations, Plaintiffs offer statements from two anonymous witnesses (hereinafter "AW1" and "AW2") both of whom worked for Zillow during the class period. (*Id*. at 16–18, 23–25.)

AW1 was a regional sales manager who was responsible for overseeing a team of sales representatives tasked with upselling and cross-selling to existing co-marketing customers. (*Id*. at 16.) AW1 states that co-marketing lenders received fewer leads than their co-marketing agents but continued to participate in the program because "lenders expected real estate agents to refer business." (*Id*. at 16–17.) She further stated that she did not believe "lenders recoup[ed] advertising costs through leads from the Zillow site but through the referral relationship forged

with the real estate agent." (*Id.* at 17.) AW1 also stated that she was personally aware of real estate agents providing their co-marketing lenders with access to their Zillow accounts so that the lender could obtain the agent's leads in cases where prospective homebuyers had opted out of giving their contact information to the lender. (*Id.*)

AW2 was a sales and operations trainer, who began working for Zillow after it merged with Trulia. (*Id.*) AW2 was responsible for training employees on the co-marketing program, "including how to talk to real estate agents about the program and the 'operations behind it.'" (*Id.*) AW2 stated that "[e]very agent and lender knew that the Co-Marketing program was for the lender to get leads and referrals," and that "everyone knew that the lenders paid the agents for leads and referrals." (*Id.*) Although AW2 stated that she trained Zillow's sales representatives to present the co-marketing program as an opportunity for agents and lenders to get more exposure to potential customers, she reiterated that "it was understood that lenders were paying for referrals." (*Id.* at 17–18.)

In support of her statements that co-marketing lenders were participating in the program to receive referrals, AW2 states that Zillow trained its sales representatives to "track the number of referrals lenders received from the Co-Marketing program." (*Id.* at 18.) She further explained that each quarter, sales representatives contacted every real estate agent customer to conduct a business assessment, at which time they would ask the agents "how much they did in lender referrals." (*Id.*) AW2 describes one instance where a co-marketing agent wanted to cancel its advertising account "because the lender [didn't] want to pay anymore." (*Id.*) According to AW2, that lender had been paying "100% of the co-marketing costs for approximately 2 ½ years." (*Id.*) Whenever AW2 spoke to Zillow about potential concerns with the co-marketing program, she was "reminded not to ask questions." (*Id.*)

A securities fraud complaint "relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco Partners*, 552 F.3d at 995. First, the confidential witness must be described "with sufficient particularity to support the

probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Second, the complaint must include "adequate corroborating details" of the confidential witness' statements. *Id.*

The second amended complaint contains sufficient facts regarding AW1 and AW2 to credit their statements. Both held positions at Zillow that provided them with working knowledge of the co-marketing program. (Dkt. No. 47 at 16–17.) As a sales manager, AW1 had direct contact with co-marketing agents and lenders, putting her in a position to understand how Zillow's customers used the program. (*Id.* at 16.) As a sales and operations trainer, AW2 had personal knowledge of how Zillow implemented the co-marketing program as well as how the company trained its employees about presenting the program to agents and lenders. (*Id.* at 17.) AW2 also dealt directly with agents when she handled "escalated" calls and was therefore familiar with how Zillow communicated with its customers about the program. (*Id.* at 18.)

The second amended complaint also contains adequate corroborating details of the anonymous witnesses' statements. Both anonymous witnesses describe how Zillow made changes to the co-marketing program in the beginning of 2017 during the CFPB's investigation. (*Id.* at 17, 23, 27.) Their statements are corroborated by Zillow's disclosure of the investigation in May 2017, and subsequent disclosure in August 2017 that the CFPB had invited Zillow to discuss a possible settlement regarding alleged RESPA violations and intended to pursue further action if a settlement was not reached. (*Id.* at 43–44.) The Court has previously ruled that the "consistent and interlocking nature" of anonymous witness testimony "bolsters the evidence's reliability and credibility." *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1140 (W.D. Wash. 2005). Here, AW1 and AW2 offer consistent and interlocking testimony about how Zillow altered the co-marketing program during the CFPB's investigation. (Dkt. No. 47 at 17, 23, 27.) The anonymous witnesses also offer consistent testimony regarding how agents and lenders used the co-marketing program to provide mortgage referrals in exchange for advertising payments. (*Id.* at 16–18.)

The anonymous witnesses' statements regarding referrals are further corroborated by Plaintiffs' allegation that in a 2017 consent judgment with the CFPB, a mortgage originator admitted to using a co-marketing arrangement on a "third-party" website to pay real estate agents for referrals. (*Id.* at 19.) While the consent judgment did not identify the third-party, Plaintiffs have alleged particularized facts that, accepted as true, allow the Court to reasonably infer that it was Zillow. (*Id.*) ("The website as described in the consent judgment mirrors Zillow's premier agent product and no other website that operated during the relevant time frame."); (*see also* Dkt. No. 52 at 1) (declaration of Plaintiffs' attorney stating basis for allegations regarding consent judgment).[3]

The anonymous witnesses' statements are further corroborated by the co-marketing program's design. The second amended complaint alleges that Zillow provided agents with a list of every user who generated a lead even when they declined to have their contact information sent to the co-marketing lender. (Dkt. No. 47 at 10.) This feature could allow agents to connect the customer with their partnering lender—either by providing the lender with a lead it would not have otherwise received or by referring the customer directly to the lender. Viewed in the light most favorable to Plaintiffs, that feature of the co-marketing program tends to corroborate AW1 and AW2's testimony that agents and lenders were engaging in a pay-for-referral arrangement.[4]

Based on the anonymous witnesses' statements, as well as the other allegations in the second amended complaint, the Court can draw a reasonable inference that Zillow designed the co-marketing program to allow agents to provide referrals to lenders in violation of RESPA, and

---

[3] Such an inference is appropriate under the PSLRA's pleading standard, which requires that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). Here, the second amended complaint states with particularity the facts underlying Plaintiffs' belief that the "third-party website" involved in the consent judgment was Zillow's. (Dkt. No. 47 at 19.)

[4] As explained in greater detail below, this feature also bolsters Plaintiffs' theory for why co-marketing lenders were willing to pay more than fair market value for the advertising they received from Zillow. *See infra* Part II.B.2.

that such referrals were occurring. The second amended complaint contains particularized facts alleging that there was an understanding between Zillow and the co-marketing participants, that in exchange for lenders paying a portion of agents' advertising costs, lenders would receive mortgage referrals from their partnering agents. That arrangement—although not ostensibly based on an oral or written agreement—is evinced by participating agents allegedly providing, and Zillow allegedly tracking, referrals to participating lenders. (*Id*. at 17–18.) Those allegations are sufficient to support an "agreement or understanding for the referral of business" based on a "pattern or course of conduct" in violation of RESPA. *See Edwards*, 798 F.3d at 1178; 12 C.F.R. § 1024.14(e). Further, the second amended complaint plausibly alleges that RESPA violations were occurring, based on the anonymous witnesses' testimony regarding how participants were using the co-marketing program and the structure of the program itself.

Defendants' arguments to the contrary are unavailing. Defendants assert that the Court should disregard the anonymous witnesses' statements because they are either contradicted by other information in the second amended complaint or not specific enough to demonstrate that the co-marketing program violated RESPA. (Dkt. No. 50 at 12–13.) Defendants point out that AW1's description of how lenders received leads through the co-marketing program is not consistent with how the process is described elsewhere in the second amended complaint. (Dkt. No. 47 at 10, 16.) However, AW1's description of how lenders received leads does not undermine the fact that lenders received significantly less leads than their co-marketing agents— a fact that Defendants do not dispute, and which supports both anonymous witnesses' testimony that lenders participated in the co-marketing program because they valued both leads and referrals. (*Id*. at 15, 17–18.)

Defendants assert that AW2 "muddles key concepts" and conflates "leads" with "referrals." (Dkt. No. 50 at 13.) That is not an accurate characterization of AW2's statements. AW2, and the second amended complaint, draw a plain distinction between leads—Zillow's provision of a prospective homebuyer's contact information to an agent, lender, or both—with

referrals—an agent's affirmative recommendation of a co-marketing lender to a prospective homebuyer or an agent's provision of a lead that a lender would not otherwise receive. (Dkt. No. 47 at 10–18.) AW2 distinguishes the two concepts when stating that lenders used the co-marketing program to get "leads and referrals," and that "lenders paid the agents for leads and referrals." (*Id*. at 17.)

Indeed, in support of her statement that "every agent and every lender knew that the Co-Marketing program was for the lender to get leads and referrals," AW2 states that Zillow representatives were trained to track the number of referrals lenders received from the co-marketing program and inquire as to "how much [agents] did in lender referrals." (*Id*. at 18.) In response to those allegations, Defendants merely argue that it "is far from clear what AW2 may have meant by 'did in lender referrals.'" (Dkt. No. 53 at 7.) What is clear, however, is the legal standard that the Court must apply at the motion to dismiss stage—that all well-pleaded allegations be accepted as true and viewed in the light most favorable to Plaintiffs. *See Khoja*, 899 F.3d at 1008. The Court cannot ignore AW2's allegations regarding Zillow's practice of tracking referrals or view them in a way that is unfavorable to Plaintiffs' RESPA theory.

Finally, Defendants assert that Plaintiffs have failed to allege a specific instance of a co-marketing agent referring mortgage business to its partnering lender. (Dkt. No. 50 at 12.) In its prior order, the Court noted that Plaintiffs had failed to allege that a specific co-market agent had provided a referral to a specific lender in exchange for the lender paying the agent's advertising costs to Zillow. (Dkt. No. 46 at 13.) The second amended complaint addresses that deficiency in at least two ways. First, Plaintiffs have alleged that a specific mortgage originator admitted to making mortgage referrals to lenders while using what the Court can reasonably infer was Zillow's co-marketing program. *See supra* Part II.B.1.a. Second, even if Plaintiffs did not offer a specific example of a co-marketing agent making illegal referrals, they offer other particularized facts that allow the Court to infer that such referrals were occurring. Such an inference is supported by the anonymous witnesses' testimony regarding why agents and lenders participated

in the co-marketing program and Zillow's tracking of referrals, as well as the structure of the program. *Id.*

   *b.*  *Allegations Regarding Fair Market Value of Co-Marketing Services*

  The second amended complaint again alleges that the co-marketing program was not protected by RESPA's safe harbor "because it permitted lenders to pay a greater share of the marketing budget than is justified by the number of leads provided by the program." (Dkt. No. 47 at 19.) Plaintiffs explain that while Zillow's official policy allowed individual lenders to pay up to 50% of an agent's advertising spend, lenders only received approximately 40% of the agent's leads.[5] (*Id.*) And in cases where multiple lenders were working with a single agent, lenders would receive much fewer leads.[6] (*Id.*) Because Zillow charges agents each time a user views a listing, and not when a customer generates a lead, Plaintiffs assert that lenders were paying more than fair market value for co-marketing advertising—a premium that Plaintiffs allege is attributable to the referrals lenders were receiving from agents. (*Id.*; Dkt. No. 51 at 16.)

  The second amended complaint contains several new factual allegations that describe how the co-marketing program's pricing "was drastically more expensive for lenders than comparable product offerings by Zillow." (*Id.* at 20.) Plaintiffs allege that Zillow offered a program that sold leads directly to mortgage lenders without the co-marketing feature. (*Id.*) According to the second amended complaint, lenders who advertised with Zillow could purchase customer leads for approximately $2.38 per lead. (*Id.*) By contrast, lenders who paid 50% of an agent's advertising costs through the co-marketing program were paying approximately $37.50

---

  [5] The co-marketing program originally allowed an individual lender to pay up to 50% of an agent's total advertising costs, and up to five lenders to collectively pay 90% of an agent's costs. (Dkt. No. 47 at 14.) In the beginning of 2017, Zillow changed the rules to allow multiple lenders to collectively pay no more than 50% of an agent's advertising costs. (*Id.* at 27.); *see infra* Part II.B.3.b.

  [6] When multiple lenders co-market with a single agent, each lender is randomly shown on the agent's listings in accordance with the lender's pro-rata contribution of the agent's overall advertising spend. (Dkt. No. 47 at 14.) Therefore, a lender's receipt of leads is directly correlated with the percentage of an agent's advertising the lender pays to Zillow.

for the leads they received.[7] (*Id*.) Plaintiffs argue that this price difference is especially anomalous because the leads Zillow sells directly to lenders are generated from prospective homebuyers who are actively searching for a mortgage lender, whereas the leads generated from the co-marketing program are more likely from homebuyers who are contacting a real estate agent about a listing and simply failed to un-check the box that forwards their contact information to the lender. (*Id*. at 20–21; Dkt. No. 51 at 16.)

Plaintiffs additionally allege that the price of co-marketing advertising did not bear a rational relationship to its actual market value because the price was based on different criteria than other advertising Zillow sold directly to lenders. (Dkt. No. 47 at 16.) For example, the price of co-marketing advertising was based on the demand in a given zip code, whereas the direct-to-lender advertising was priced according to a prospective homebuyers' "credit rating, loan amount, and loan type." (*Id*.) Plaintiffs assert that these variations in pricing further demonstrate that co-marketing advertising fell outside RESPA's safe harbor, which requires that payments for mortgage-related services "must be commensurate with the amount normally charged for similar services in similar transactions in similar markets." *See Schuetz*, 292 F.3d at 1011.

The second amended complaint also describes how, in practice, the co-marketing program allowed lenders to evade the 50% cap that Zillow officially placed on advertising payments. (*Id*.) AW2 stated that, notwithstanding the 50% cap, it "was possible for a lender to make a payment of up to 90% of co-marketing costs through the Zillow website." (*Id*. at 23.) As previously mentioned, AW2 was personally aware of one co-marketing lender who paid "100% of the co-marketing costs for approximately 2 ½ years." (*Id.* at 18.) Although AW2 would train Zillow sales representatives about the 50% cap, sales representatives would still "tell agents that

---

[7] The Court accepts as true these well-pleaded allegations, which are based on the percentage of leads co-marketing lenders receive on average, in comparison to the percentage of advertising they paid, as well as publicly available information estimating the price of purchasing leads directly from Zillow. (Dkt. No. 47 at 19–20.) These particularized facts allow the Court to infer that co-marketing leads cost significantly more than leads purchased directly from Zillow.

the lender could pay up to 90%." (*Id.*) When AW2 reported to her superiors that practice might violate RESPA, she was told that the company had "bigger issues to deal with." (*Id.*)

The second amended complaint corroborates AW2's statements about co-marketing overpayments with allegations from a 2015 wrongful termination lawsuit filed against Zillow, in which two former employees were allegedly fired after reporting similar violations to Zillow's upper management. (*Id.* at 22) (citing *Boehler v. Zillow, Inc.,* Case No. 14-CV-01844-DOC, 2015 WL 12743688 (C.D. Cal. 2015)). In *Boehler*, the plaintiffs reported several instances in which co-marketing lenders provided Zillow with a single credit card to bill both the lenders' and agents' portion of advertising costs. (Dkt. No. 47 at 22.) The plaintiffs believed that such a practice violated RESPA by allowing individual lenders to evade the 50% cap on payments of an agent's advertising costs. (*Id.*) The plaintiffs were fired for allegedly identifying these and other suspected violations to various Zillow executives, including Rascoff.[8] (*Id.* at 22–23.) The allegations in *Boehler* corroborate AW2's description of how, in practice, lenders could use the co-marketing program to pay more than 50% of an agent's advertising costs.

Based on the above allegations, the Court can draw a reasonable inference that Zillow designed the co-marketing program to allow lenders to pay more than fair market value for the advertising they received and therefore fell outside RESPA's safe harbor provision. The second amended complaint contains particularized facts demonstrating that Zillow allowed lenders to pay more for co-marketing advertising than for similar advertising products Zillow sold to lenders. Further, Plaintiffs have alleged that lenders were not only paying more than 50% of an agent's advertising costs, but that Zillow, through its design of the program and inaction in enforcing the spending cap, was allowing the practice to occur. The Court can reasonably infer that lenders were paying more for co-marketing advertising than was "commensurate with the

[8] Boehler allegedly sent an email to Rascoff that identified four separate instances where a single credit card was supplied both for an agent and a co-marketing lender. (Dkt. No. 47 at 22.)

amount normally charged for similar services in similar transactions in similar markets." *See*

*Schuetz*, 292 F.3d at 1001. Such an inference is especially warranted when considering that the

second amended complaint has plausibly alleged that lenders and agents were using the co-

marketing program to make referrals in violation of RESPA Section 8(a). *See supra* Part II.B.1.a.

Defendants have not persuaded the Court otherwise. Defendants challenge Plaintiffs'

method for calculating the price or value that lenders place on leads. (Dkt. No. 50 at 14.) As an

initial matter, Defendants argue that Plaintiffs incorrectly assume that lenders only valued leads,

without taking into consideration other benefits offered by co-marketing advertising such as

lenders appearing next to agents on their listing. (*Id.*) In its prior order, the Court acknowledged

that Plaintiffs' theory of fair market value did not account for benefits co-marketing lenders

received other than leads. (*See* Dkt. No. 46 at 14.)

Viewed in the light most favorable to Plaintiffs, the second amended complaint alleges

facts that allow the Court to infer that co-marketing lenders primarily valued leads and referrals.

Zillow emphasized the importance of leads when marketing the program to agents and lenders

(Dkt. No. 47 at 15, 21.) In a 2016 webinar targeted at co-marketing agents, Zillow

representatives suggested that agents should initially ask lenders to pay 30% of their advertising

costs, but could increase that amount once the lender gets "a taste for the contacts and how it all

works." (*Id.* at 15–16.) The Court can infer that the term "contacts" was a reference to the leads

lenders would receive, and ostensibly value, by paying more of an agent's advertising costs.

The program was also designed in ways that increased the amount of leads and referrals

lenders would receive—prospective homebuyers had to "opt-out" of generating a lead, and

Zillow informed agents of those who opted-out so that they could still provide the information to

lenders. (*Id.* at 10, 15.) As previously mentioned, both anonymous witnesses described how

lenders participated in the co-marketing program to receive leads and referrals. (Dkt. No. 47 at

17–18) (AW1: noting that agents "provided access to their Zillow accounts to lenders to access

leads.") (AW2: "Everyone knew that the lenders paid the agents for leads and referrals."). The

anonymous witnesses' statements are supported by the way Zillow promoted the program to agents and by the program's design, which funneled leads to lenders and put agents in a positions to provide lenders with referrals.

Defendants also assert that "[t]here is no basis to conclude from Plaintiffs' allegations what the fair market value of co-marketing is for any given lender in any given market at any given time; that is a matter that Zillow leaves to the lenders and real estate agents to determine for themselves." (*Id*.) The Court disagrees with Defendants' characterization of fair market value. First, it fails to address the allegedly unexplained differences in pricing that Zillow placed on co-marketing versus non-co-marketing advertising products. As the Court has explained above, Plaintiffs have plausibly alleged facts that suggest the price difference could be attributed to co-marketing lenders receiving referrals from agents. *See supra* Part II.B.1.b.

Second, it is inaccurate to say, as Defendants do, that Zillow left the determination of the fair market value of co-marketing advertising entirely up to agents and lenders. Zillow expressly capped the amount that individual lenders could pay for co-marketing advertising. (Dkt. No. 47 at 15.) In the 2016 webinar, Zillow representatives suggested that between 30–50% of an agent's advertising costs was the appropriate amount for lenders to pay. (*Id*. at 15–16.) It is reasonable to infer that the cap was in place to ensure that lenders were not paying more than the market value of the advertising services they were receiving in return—lest Zillow, and its co-marketing customers, come under regulatory scrutiny.[9]

Finally, Defendants fail to address the second amended complaint's numerous allegations that lenders were able to pay more than 50% of an individual agent's advertising costs and were doing just that. AW2 stated that Zillow sales representatives would regularly inform agents that lenders "could pay up to 90% of co-marketing costs through the Zillow website." (*Id*. at 23.)

---

[9] In drawing this inference the Court also considers the allegation that several large lenders refused to pay more than 31% of an agent's advertising spend because that is what they viewed as fair market value of co-marketing advertising. (Dkt. No. 47 at 15.)

AW2 was personally aware of a lender paying 100% of an agent's co-marketing costs, and the *Boehler* lawsuit contained similar allegations of lenders being able to evade the spending cap. *See supra* Part II.B.1.b.

Taken together, the allegations contained in the second amended complaint allow the Court to draw a reasonable inference that the co-marketing program allowed lenders to pay more than fair market value for the advertising Zillow provided in return. The foregoing allegations also satisfy the Court's prior order that Plaintiffs "assert particularized facts that demonstrate that Zillow designed the co-marketing program to violate RESPA, and that Zillow was instructing and encouraging third-parties to commit such violations." (Dkt. No. 46 at 32.)

### 2. CFPA Violations

For the first time in the second amended complaint, Plaintiffs allege that Zillow "substantially assisted" co-marketing agents and lenders in committing RESPA violations, which represent "abusive practices" as defined by, and in violation of, the CFPA. (Dkt. No. 47 at 24–25.) The CFPA empowers the CFPB to undertake enforcement actions to prevent covered persons from committing or engaging in "an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). The statute allows the CFPB to promulgate rules "identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(b). The CFPB may not declare an act or practice "abusive" unless it:

(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) takes unreasonable advantage of–

(A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

(B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

(C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

12 U.S.C. § 5531(d). In addition to imposing criminal liability on primary violators, the CFPA makes it unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 5531 of this title, or any rule or order issued thereunder . . . ." 12 U.S.C. § 5536(a)(3).

Plaintiffs' CFPA theory is twofold. First, they assert that violations of RESPA Section 8(a), represent "abusive practices" as defined by Section 5531(d). (Dkt. No. 51 at 18.) They argue that co-marketing agents and lenders were therefore committing "abusive practices" by exchanging mortgage referrals for the payment of advertising costs, and by paying above fair market value for the advertising lenders received from Zillow. (*Id*. at 18–19; Dkt. No. 47 at 24–25.); *see supra* Part II.B.1. Second, Plaintiffs assert that Defendants knowingly or recklessly provided substantial assistance to agents and lenders to violate RESPA, by designing the co-marketing program to facilitate and encourage such violations. (Dkt. No. 47 at 25); *see supra* Part II.B.1. Plaintiffs' CFPA theory is grounded on the same facts as its RESPA theories.

Neither the CFPA, nor a rule or regulation promulgated by the CFPB, state that a violation of RESPA Section 8(a) represents a *per se* "abusive practice" under Section 5531. Plaintiffs do not assert, and the Court is not aware of any court that has ruled that RESPA violations represent an abusive practice under the CFPA. Plaintiffs instead assert that "the Court should read § 5531 in the context of abusive practices that other statues establish," and note that one of RESPA's purposes is to "eliminate abusive practices such as kickbacks, referral fees, and unearned fees." (Dkt. No. 51 at 19) (quoting *Schuetz*, 292 F.3d at 1008). The Court declines to make such a ruling.

The Court has held that the second amended complaint plausibly alleges that Zillow violated RESPA by designing the co-marketing program to allow agents to illegally refer mortgage business to lenders in exchange for paying advertising costs, by encouraging such referrals, and by allowing lenders to pay above fair market value for the advertising they

received in return. *See supra* Part II.B.2. Considering that ruling—and the fact that this is not a CFPB enforcement action, but a private securities action—the Court rejects Plaintiffs' CFPA theory of liability, to the extent such alleged violations would establish that Defendants made material misleading statements in support of Plaintiffs' Exchange Act Claims.[10]

3. <u>Misleading Statements</u>

A statement or omission is misleading under the PSLRA and Section 10(b) of the Exchange Act "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation marks and citation omitted). A false or misleading statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). To plead materiality, a complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017).

The Ninth Circuit recently clarified the standard for pleading the falsity of opinion statements. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017) (discussing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323–32 (2015)). It explained that three different standards can apply depending on the theory of falsity:

> First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that "the speaker did not hold the belief she professed" and that the belief is objectively untrue. Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that "the supporting fact the speaker supplied is untrue."

---

[10] This ruling is made without prejudice to Plaintiffs reasserting the theory at a later stage of the litigation.

Third, when a plaintiff relies on a theory of omission, the plaintiff must allege "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement misleading to a reasonable person reading the statement fairly and in context."

*Align Tech*, 856 F.3d at 615–16.

Having determined that the second amended complaint plausibly alleges that Zillow designed the co-marketing program to allow agents and lenders to violate RESPA Section 8(a) and encouraged such violations, the Court now turns to the specific statements Plaintiffs assert were materially misleading. The statements can generally be classified as (1) Zillow's publicly-filed statements regarding its general legal compliance, and (2) Phillips' and Rascoff's statements regarding the co-marketing program and the CFPB's investigation of it. (*See* Dkt. No. 47 at 29–45.)

### a. Zillow's Statements Regarding General Legal Compliance

On February 18, 2014, Zillow filed a Form 10-K ("2013 10-K") with the SEC in which it stated the following regarding the company's compliance with government regulations:

> [T]he real estate agents, mortgage brokers, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. While we do not believe that we are currently subject to these regulations, we intend to ensure that any content created by Zillow is consistent with them by obtaining assurances of compliance from our advertisers and customers for their activities through, and the content they provide on, our mobile applications and websites.

(*Id*. at 29.) The 2013 10-K was incorporated by reference in Zillow's initial registration statement that was signed by Defendants Rascoff and Phillips. (*Id*.) The initial registration statement also included the merger agreement between Zillow and Trulia. (*Id*. at 29–30.) The merger agreement included the following warranty: "[n]either Zillow nor any Zillow Subsidiary is in conflict with, or in default, breach or violation of, (a) any Law applicable to Zillow or any Zillow Subsidiary . . . ." (*Id*. at 30.)

On February 17, 2015, Zillow filed a Form 10-K ("2014 10-K") that included nearly identical language as the 2013 10-K regarding the company's compliance with government

regulations. (*Id.*) Acknowledging that its customers were subject to various state and federal laws and regulations, Zillow stated that "[w]e endeavor to ensure that any content created by Zillow is consistent with them by obtaining assurances of compliance from our advertisers and customers for their activities through, and the content they provide on, our mobile applications and websites." (*Id.* at 31.)[11] In February of 2016 and 2017, Zillow filed a Form 10-K ("2015 10-K" and "2016 10-K" respectively) that were signed by Rascoff and Phillips and contained identical language as the 2014 10-K about the company's efforts of legal compliance with the laws and regulations to which its customers are subject. (*Id.* at 35.) [12]

Plaintiffs allege that Defendants' statements regarding Zillow's legal compliance—that it "intended" or "endeavored" to ensure compliance "by obtaining assurances of compliance" from its customers—were misleading "for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA." (*Id.* at 29–30) As previously discussed, Plaintiffs assert that the co-marketing program violated RESPA "by allowing lenders to pay in excess of fair market value for co-marketing services . . . [and] by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money." (*Id.* at 30.)

The Court characterizes Zillow's general legal compliance statements as opinions supported by embedded facts. Zillow's statements that it intended or endeavored to comply with relevant laws and regulations express a belief that the company was following the law. (Dkt. No. 47 at 29); *see Omnicare*, 135 S. Ct. at 1325 (stating that an opinion is "a belief[,] a view, or a

---

[11] Plaintiffs additionally allege that the following documents contained misleading statements because they incorporated the statements contained in the 2014 10-K by reference: a February 2015 Form S-8, an April 2015 Form S-3, an August 17, 2015 Form S-8 Registration Statement, and an August 21, 2015 Form S-8 Registration Statement. (Dkt. No. 47 at 32–33.)

[12] Plaintiffs additionally allege that the following documents contained misleading statements because they incorporated the statements contained in 2015 10-K and 2016 10-K by reference: a March 2016 Form S-8, an August 2016 Form S-8, and a February 2017 Form S-8. (Dkt. No. 47 at 36.)

sentiment which the mind forms of persons or things" (internal quotation marks omitted)).

However, Zillow's opinion that it was endeavoring to comply with the law was based on the factual assertion that it was "obtaining assurances of compliance from our advertisers and customers for their activities through, and the content they provide on, our mobile applications and websites." (*Id.*) That statement is not one of belief, but rather expresses that Zillow was taking affirmative action to ensure compliance. *See Omnicare*, 135 S. Ct. at 1325 (stating that "a fact is a thing done or existing or [a]n actual happening." (internal quotation marks omitted)).

Plaintiffs have alleged particularized facts demonstrating that Defendants' legal compliance statements were materially misleading under the omission theory described in *Align Tech.*, 856 F.3d at 610. As explained above, the second amended complaint plausibly alleges that Defendants designed the co-marketing program to allow agents and lenders to exchange payments for referrals in violation of RESPA, and that Zillow was encouraging this practice. *See supra* Part II.B.1. Plaintiffs also allege particularized facts demonstrating that the co-marketing program was designed to allow lenders to pay above fair market value for the advertising services they received from Zillow. *See supra* Part II.B.2.

Defendants' omission of such facts—for example, Zillow inquiring about and tracking agent's referrals, or that the co-marketing program allowed lenders to pay more than the fair market value for advertising—make their opinion about its general legal compliance materially misleading. The omission of such facts was material because it would have been viewed by a reasonable investor "as having significantly altered the 'total mix' of information made available," regarding Zillow's stock. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 449. A reasonable person would have viewed the omissions as misleading because the omitted facts tend to suggest Zillow did not actually intend or endeavor to comply with laws and regulations such as RESPA.

Defendants have repeatedly stated that any opinions regarding the company's legal compliance cannot be viewed as misleading because Zillow was not providing any referrals to

lenders such that it could have violated RESPA. (Dkt. No. 50 at 11–12.) As the Court has explained, however, the second amended complaint has adequately pled that the co-marketing program did not comply with RESPA. *See supra* Part II.B.1–2. And even if Zillow were not a primary RESPA violator, its omissions regarding the co-marketing program allowing lenders to pay more than fair market value for advertising was materially misleading when considered in the context of the company's assertion that it was "obtaining assurances of compliance from our advertisers and customers for their activities through, and the content they provide on, our mobile applications and websites." (Dkt. No. 47 at 29, 31, 35.)

Unlike the allegations contain in the amended complaint, Plaintiffs have now alleged particularized facts demonstrating that Zillow designed the co-marketing program in a way that violated RESPA and that such violations were occurring. *Cf. In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 951–52 (9th Cir. 2017) (holding that a corporate defendant's statement that it "endeavored" to comply with an FTC order was not misleading where the complaint lacked particularized facts to show that the defendants knew that a certain practice violated the order). Therefore, Plaintiffs have plausibly alleged that Defendants' statements regarding Zillow's legal compliance were materially misleading.[13]

   b.   *Phillips' Statements Regarding the Co-Marketing Program*

Plaintiffs allege that Phillips made several misleading statements when discussing the co-marketing program and the CFPB's inquiry into it. (Dkt. No. 47 at 33–43.) As a general matter, federal securities laws do not require corporations to disclose the initiation of a government investigation. *See Basic v. Levinson*, 485 U.S. 224, 234 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Metzler*, 540 F.3d at 1071; *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) ("[A] government investigation, without more, does not trigger a generalized duty to disclose.") While there is no general duty to

---

[13] The Court's ruling applies to all of Zillow's publicly-filed written statements that Plaintiffs allege were materially misleading. (*See* Dkt. No. 47 at 22–33.)

disclose investigations, corporations have "a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992). Failure to disclose an investigation can be actionable if the corporation makes "some affirmative statement or omission . . . that suggested it was not under any regulatory scrutiny." *Metzler*, 540 F.3d at 1071.

During a November 3, 2015 conference call with investors, Phillips was involved in the following exchange with an analyst:

> **Analyst:** Can you just give us a sense for how much the mortgage co-advertising is contributing to agent revenue? And kind of what penetration is? Where you think it can go? And is the RESPA or CFPB kind of investigations into this is – is this something that should be a concern? Or something that you think is not really an issue?

> **Phillips:** Co-marketing with lenders and agents is a very small part of our business, a small contributor to ARPA revenue. Importantly though, we are not seeing lenders depart from this program notwithstanding all of the discussions in the marketplace about the CFPB and the CFPB's recent pronouncements and actions. I can assure you that we work diligently to comply with all of the rules put forth by government agencies and of course, we monitor the CFPB and the things that they are saying and doing to make sure that we remain in compliance and to make sure that we understand how their activities relate to our business.

(Dkt. No. 47 at 33.) On February 2, 2017, Phillips said on a conference call that "we believe our co-marketing program has, and continues, to allow agents and lenders to comply with the law while using our product." (*Id*. at 38.) In response to a question about whether agents and lenders had changed their behavior regarding use of the co-marketing program, Phillips stated:

> [W]e haven't observed anything specific, but I can tell you that real estate agents and lenders are pretty keenly aware of the restrictions that are placed upon their co-marketing efforts through RESPA and other regulatory regimes. So they are intent on complying and pay close attention to their own behavior, monitoring themselves. We think though the way that we have put this product together enabled agents and lenders to participate in full compliance with the law.

(*Id*.) On May 4, 2017, following Zillow's disclosure of the CFPB's investigation into the co-marketing program, Phillips again stated on a conference call that "we believe our co-marketing

program has, and continues to, allow agents and lenders to comply with the law while using our product." (*Id.* at 42.) She went on to say "[w]e think though that the way we have put this product together enabled agents and lenders to participate in full compliance with the law." (*Id.* at 42–43.)

Plaintiffs allege that Phillips' statements in November 2015 and February 2017 were misleading "for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA." (*Id.* at 34.) Plaintiffs support that allegation by asserting that Zillow received a subpoena from the CFPB on April 1, 2015, that was "in connection with an investigation by the CFPB into potential violations of RESPA related to Zillow's co-marketing program." (*Id.* at 27.)

In its prior order, the Court ruled that Phillips' statement "was not misleading because it was neither an affirmative statement nor omission that suggested Zillow was not under regulatory scrutiny." (Dkt. No. 46 at 19.) The second amended complaint does not include any additional facts that would lead the Court to change its conclusion. However, Plaintiffs also allege that Phillips' statements were materially misleading for failing to disclose that the co-marketing program was designed to facilitate RESPA violations and for failing to disclose that Zillow had changed the program in response to the CFPB's investigation. (Dkt. No. 47 at 34.) On this score, the Court agrees that the statements were materially misleading.

Phillips' statement to analysts that "I can assure you that we work diligently to comply with all of the rules put forth by government agencies," was materially misleading for the same reasons Zillow's general statements of legal compliance were misleading. *See supra* Part II.B.3.a. Similarly, Phillips' statements in February and May 2017 that "we think though that the way we have put this product together enabled agents and lenders to participate in full compliance with the law," were misleading because she omitted that Zillow designed the co-marketing program to allow agents and lenders to violate RESPA and the company was encouraging such violations. *Id.*

Phillips' statements regarding legal compliance were also misleading for failing to disclose that Zillow had altered the co-marketing program in the midst of the CFPB's investigation. Plaintiffs allege that in the beginning of 2017, Zillow lowered the percentage of an agent's advertising costs lenders could collectively contribute and concealed the change from the public by not updating its website. (*Id.* at 27–28.) Both anonymous witnesses stated that in the beginning of 2017, Zillow began instructing its employees to change the way it presented the co-marketing program to customers. (*Id.* at 17, 27–28.) AW2 states that, "following Zillow's receipt of a letter from the CFPB," she was responsible for training sales reps on "new messaging to agents regarding the Co-Marketing program." (*Id.* at 17.) AW2 began training employees to "pitch co-marketing to real estate agents by explaining to them that the program was an opportunity for the agent with a relationship with a lender for them to get more exposure." (*Id.* at 17–18.) AW1 stated that in the beginning of 2017 she and other sales representatives were "instructed to explain to agents that Zillow was capping total lender contributions at 50% of total advertising costs." (*Id.* at 27.) She stated that this caused confusion with customers because the change "was not reflected on Zillow's website," and was different than "what [she] was providing to agents." (*Id.* at 28.)

In its prior order, the Court ruled that Plaintiffs had not pled particularized facts demonstrating that the change to the co-marketing program was done in response to the CFPB's investigation. (Dkt. No. 46 at 22.) The Court noted that "[w]hile the confidential witness states that she believes the changes were implemented in response to a government investigation, neither she, nor the amended complaint, contain particularized facts that demonstrate the co-marketing program was altered to 'remedy RESPA violations identified by the CFPB.'" (*Id.*) [14] The second amended complaint cures that deficiency, because it has plausibly alleged that the co-marketing program violated RESPA by allowing lenders to pay above fair market value for the advertising Zillow provided. *See supra* Part II.B.2 Considering those new allegations, the

---

[14] The amended complaint did not include AW2's allegations.

Court can reasonably infer that the change Zillow implemented—capping collective lender contributions at 50% of an agent's advertising spend—was an attempt to limit lenders from paying more than fair market value for co-marketing advertising. *See supra* Part II.B.2.

Plaintiffs have plausibly alleged that Phillips' statement in 2017 that Zillow believed it had put the co-marketing program together in a way "that enabled agents and lenders to participate in full compliance with the law," was materially misleading for omitting that Zillow had altered the program. (Dkt. No. 47 at 38–43.) A reasonable person would find that opinion misleading if Phillips had disclosed that Zillow had recently made changes to the co-marketing program to bring it into compliance with RESPA. As explained above, Plaintiffs have plausibly alleged that Phillips' statements made in February 2017 and May 2017 regarding Zillow's legal compliance were materially misleading.

c.    *Rascoff's Statements Regarding the Co-Marketing Program*

Plaintiffs allege that Rascoff made misleading statements in May 2017 during an interview on an internet-based television channel. (*Id.* at 40–41.) During the interview, he said the following about the co-marketing program:

> [T]wo years ago the CFPB started asking us questions about [the co-marketing program] and we've been talking with them literally for two years. We think the way we've constructed the program is completely compliant and allows agents and lenders to stay within the confines of the laws that govern this, but we're still talking to the CFPB about it so we'll see.

(*Id.* at 40.) Rascoff was then asked, "if it's a case where you had to alter the co-marketing program how much of an impact would it be on the company?" Rascoff responded that "it's really hard to speculate hypothetically because we have no idea whether this ends up being blessed or not. It could have no impact or it could have an impact." (*Id.*)

As with Phillips' statements, Plaintiffs allege that Rascoff's statements were materially misleading for failing to disclose that the co-marketing program was designed to facilitate RESPA violations and for failing to disclose that Zillow had changed the program in response to the CFPB's investigation. (*Id.* at 40.) The Court agrees. Rascoff's statement that "[w]e think the

way we've constructed the program is completely compliant and allows agents and lenders to stay within the confines of the laws that govern this," was materially misleading because it omitted that Zillow designed the co-marketing program to allow agents and lenders to violate RESPA, and that the company was encouraging such violations. *See supra* Part II.B.3.b. It was also misleading for omitting that Zillow had recently altered the co-marketing program to bring it into compliance with RESPA in response to the CFPB's inquiry. *See supra* Part II.B.3.c. Rascoff's response to a question about altering the co-marketing program was also materially misleading for omitting that Zillow had already altered the program in response to the CFPB's inquiry. *Id.* Therefore, the second amended complaint plausibly alleges that Rascoff's statements in May 2017 were materially misleading.

### 3. Scienter

In the context of a securities fraud claim, scienter is a mental state that is characterized by an intent "to deceive, manipulate, or defraud." *Metzler*, 540 F.3d at 1065–66 (citation omitted). In the Ninth Circuit, scienter requires that a defendant make the false or misleading statement "intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 995.

To adequately plead scienter, the PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). A "strong inference" of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *WPP Luxembourg*, 655 F.3d at 1051–52 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). Additionally, a court must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 322–23. The Ninth Circuit has established the following two-step inquiry to determine whether a securities fraud complaint pleads a strong inference of scienter:

[F]irst, we will determine whether any of the plaintiff's allegations, standing alone,

are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.

*Zucco Partners*, 552 F.3d at 992. When assessing whether a plaintiff has adequately pled a strong inference of scienter, courts must consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *In re Daou Sys., Inc.*, 411 F.3d at 1022 (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002)).

The Court begins its scienter analysis by evaluating the allegations Plaintiffs assert are indicative of Rascoff and Phillips' scienter. After assessing those allegations individually, the Court will holistically review Plaintiffs' allegations to determine whether they allow the Court to draw a strong inference that Defendants' misleading statements were intentional or made with deliberate recklessness.

a.    *Individual Allegations Regarding Rascoff's Scienter*

Plaintiffs again allege that Rascoff's scienter can be inferred "from his participation in investor conference calls where Defendants made false exculpatory statements, and his thorough preparations for those conference calls." (*Id.* at 45–46.) Plaintiffs describe in detail how Rascoff thoroughly prepared for the relevant conference calls: that he reviewed emails provided to him from each of Zillow's departments and that he spent several days prior to the calls preparing his remarks. (*Id.* at 39–40.) Given his preparation, Plaintiffs assert that Rascoff's statements on the calls "could not have been innocently made." (*Id.* at 39.) The Court previously declined to draw an inference of scienter from this conduct because, viewed on its own, Rascoff's preparation for conference calls allows the Court to draw an equally cogent inference that Rascoff wanted to ensure that what he and other Zillow executives said was accurate, not misleading. (*See* Dkt. No. 46 at 24.); *see also In re Daou Sys., Inc.*, 411 F.3d at 1006 (finding that the Court must consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to

the plaintiffs").[15] The second amended complaint does not include any additional allegations regarding Rascoff's preparation for conference calls that would change the Court's ruling. (*See* Dkt. No. 47 at 46–47.)

Plaintiffs allege that Rascoff's scienter can also be inferred from his awareness of the *Boehler* lawsuit prior to the beginning of the class period. (*Id.* at 47.) The Court previously rejected this scienter theory, emphasizing that the *Boehler* allegations were too vague and unrelated to Plaintiffs' claims to infer Rascoff's scienter. (Dkt. No. 46 at 24.) Although the second amended complaint contains more specific information regarding the claims alleged in *Boehler*, they still fall short of demonstrating that Rascoff's subsequent statements evidenced a strong inference of scienter. (*Compare* Dkt. No. 35 at 38–39, *with* Dkt. No. 47 at 22–23.)

As discussed above, the plaintiffs in *Boehler* asserted that, among other things, a few lenders were paying above the 50% cap on co-marketing advertising by having Zillow charge a single credit card for both the lender and agent's portion of the cost. (*Id.* at 22–23, 46.) Plaintiffs state that Rascoff received an email about these allegations, which demonstrates he was on notice that "the co-marketing program was used to evade RESPA." (*Id.* at 46.) Plaintiffs characterize the *Boehler* allegations as "red flags," that other courts have found sufficient to infer scienter. (Dkt. No. 51 at 24) (citing *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1102 (9th Cir. 2011)).

While Rascoff's knowledge of the *Boehler* lawsuit certainly indicates that he was aware of how the co-marketing program operated, it does not support a strong inference of scienter regarding his statements made in May 2017. The relevant allegations in *Boehler* are different than the Plaintiffs' core allegations in this lawsuit—that co-marketing agents were making illegal referrals to lenders in exchange for the lenders paying above fair market value for advertising services. (*See generally* Dkt. No. 47.) Moreover, Rascoff's knowledge of a few instances in 2013

---

[15] Plaintiffs do not allege that Rascoff made misleading statements on the relevant conference calls, but during an unrelated television interview. (Dkt. No. 47 at 46–47.)

of lenders allegedly paying more than the 50% cap for co-marketing advertising does not allow for a cogent inference that Rascoff was deliberately reckless in 2017 when expressing an opinion about the program's legal compliance in lieu of the CFPB's investigation. The link between the *Boehler* allegations and Rascoff's statements is simply not strong enough, by itself, to draw a strong inference of scienter.

Finally, Plaintiffs allege that Rascoff's scienter can be inferred from the several misleading statements that he made during the May 2017 interview. (*Id*. at 47.) Plaintiffs assert that Rascoff's statements were intended to be misleading because the co-marketing program did not provide Zillow with a "small" amount of revenue, the program was not compliant with RESPA, and Zillow had already altered the program in response to the CFPB's investigation. (*Id*.) Plaintiffs assert that the co-marketing program did not provide a small amount of revenue based on a 2017 independent analysis that concluded 10% of Zillow's revenue had exposure to the co-marketing program. (*Id*. at 43.)

Essentially, Plaintiffs argue that if Rascoff made several misleading statements in one interview, then the Court can infer that each statement was made with the intent to deceive. While the Court has ruled that Rascoff's statements regarding the co-marketing program were materially misleading, it does not necessarily follow that they were also made with the requisite scienter. The Court does not find that Rascoff's statements, even when considered together, demonstrate that they were made with an intent to deceive. For those reasons, none of the above allegations, taken individually, support a strong inference of Rascoff's scienter.

### b. Individual Allegations Regarding Phillips' Scienter

Plaintiffs assert that Phillips' scienter can be inferred from: (1) her preparation for and false statements made during several conference calls during the class period; (2) her dual position as Zillow's Chief Financial Officer and Chief Legal Officer and (3) her role in performing due diligence with respect to Zillow's merger with Trulia. (Dkt. No. 47 at 47–50.) As with Plaintiffs' allegations against Rascoff, the Court concludes that Phillips' preparation for

conference calls and her statements during those calls do not demonstrate a strong inference of scienter. *See supra* Part II.C.3.a.

Plaintiffs allege that Phillips' scienter can be inferred from her position as Zillow's CFO and CLO. (Dkt. No. 47 at 48.) Plaintiffs specifically assert that the Court can infer that "Phillips knew, or was reckless in not knowing, that the Program violated the law based on her role in the Company and her exposure to the workings of the Program due to the CFPB's regulatory inquiry." (Dkt. No. 51 at 22.) Plaintiffs similarly allege that because Phillips "was responsible for conducting due diligence on the merger with Trulia with respect to legal matters, [she was] therefore responsible for ensuring the truth of Zillow, Inc.'s representation that none of Zillow's operations were in breach or violation of any applicable laws." (Dkt. No. 47 at 48.) The second amended complaint contains the testimony of a purported expert in merger and acquisition transactions, who asserts that a corporate officer in Phillips' position "would have conferred closely with compliance personnel and department heads in analyzing Zillow's compliance with, and legal exposure to, any rules, regulations and laws, including RESPA." (*Id.* at 49–50.)

The Court concludes that none of the allegations regarding Phillips' position in Zillow, by itself, demonstrate that her statements were made with a strong inference of scienter. However, as explained in the following section, the Court again considers these allegations as part of its holistic review regarding Defendants' scienter.

### c. Scienter Allegations Viewed Holistically

In its prior order, the Court ruled that the allegations contained in the amended complaint, taken collectively, did not support a strong inference of scienter. (Dkt. No. 46 at 28.) That conclusion rested heavily on the Court's determination that Plaintiffs had failed to allege particularized facts to support their theory that Zillow designed the co-marketing program in a way that allowed agents and lenders to violate RESPA and that the company was encouraging such violations. (*Id.* at 28.) In the absence of such facts, the Court concluded that Defendants' statements were not materially misleading and supported an opposite inference than the one

Plaintiffs argued was indicative of their scienter —that "Defendants believed the co-marketing program did not violate RESPA." (*Id*.)

As the Court has now explained in close detail, the second amended complaint contains particularized facts that plausibly allege Zillow designed the co-marketing program in a way that violated RESPA and that Zillow was encouraging such violations. *See supra* Part II.B.1–2. Having made that finding, the Court now concludes that the allegations in the second amended complaint, viewed holistically, support a strong inference that both Rascoff and Phillips were deliberately reckless in making the statements that the Court has identified as materially misleading.

In reaching this conclusion, the Court relies on the so-called "core operations" inference to establish scienter. *See S. Ferry LP No. 2 v. Killinger*, 687 F. Supp. 2d 1248, 1254 (W.D. Wash. 2009). "Under the core operations theory, it is reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operations of their companies." *Id*. The Court has previously held that scienter can be inferred where a corporate officer states that he or she knew about or was monitoring the subject of the misleading statements. *Id*. at 1258–59. "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." *South Ferry*, 542 F.3d at 784.

The second amended complaint alleges particularized facts demonstrating that the co-marketing program was part of Zillow's core operations and that Rascoff and Phillips made various statements displaying their familiarity with the program. Zillow's primary source of revenue is selling advertising to real estate agents, with the co-marketing program being one of its products. (Dkt. No. 47 at 9.) In November 2015, Phillips stated that "co-marketing with lenders and agents is a very small part of our business, a small part of [Average Revenue Per Account]." (*Id*. at 26.) In May 2017, Phillips reiterated that "we don't break out the amount of the revenue that comes from co-marketing efforts, but we have said and it continues to be the case that it's a small portion of overall revenue." (*Id*. at 38.) Later that month, while discussing

the CFPB's investigation into the co-marketing program, Rascoff said "We haven't disclosed the amount of revenue [from co-marketing], we've said its small, but we haven't disclosed it, and you know, it's an ongoing conversation." (*Id*. at 40.) In contrast to these statements, an May 2017 independent financial analysis suggested that "in excess of 10% of Zillow's revenue was exposed to illegal co-marketing, and that revenues from co-marketing are highly profitable." (*Id*. at 43.)

Phillips and Rascoff also made numerous statements displaying their familiarity with how the co-marketing program was designed and operated. As the CFPB began increasing enforcement actions in 2015, Phillips stated that "we are not seeing lenders depart from [the co-marketing program] notwithstanding the CFPB and the CFPB's recent pronouncements and actions," and that Zillow "monitor[ed] the CFPB and the things that they are saying and doing to make sure that we remain in compliance and to make sure that we understand how their activities relate to our business." (*Id*. at 34.) In February 2017, Phillips stated that "[w]e think though that the way we have put [the co-marketing program] together enabled agents and lenders to participate in full compliance with the law." (*Id*. at 38.) Acknowledging the CFPB's two-year investigation into the co-marketing program, Rascoff stated that "[w]e think the way we've constructed the program is completely compliant and allows agents and lenders to stay within the confines of the law that govern this." (*Id*. at 40.)

Given that Phillips and Rascoff were familiar with how the co-marketing program "was put together" and "structured," the Court can reasonably infer that they would have been aware of those aspects of the co-marketing program that Plaintiffs have plausibly alleged violated RESPA. For example, both Phillips and Rascoff must have known that Zillow was instructing employees to track the amount of business co-marketing agents "did in lender referrals," or that individual lenders could use the program to pay more than the 50% cap on advertising. *See supra* Part II.B.1–2. Given that Phillips and Rascoff were "monitor[ing] the CFPB and the things that they are saying and doing," the Court can reasonably infer that they would have been aware of

January 2017 consent judgment that suggested the co-marketing program was being used to violate RESPA and familiar with the CFPB's investigation of Zillow's co-marketing program. *See supra* Part II.B.2. Such inferences seem particularly appropriate when also considering the other allegations Plaintiffs have alleged in support of Defendants' scienter: that Rascoff was aware of RESPA violations involving the co-marketing program, that Phillips performed detailed due diligence regarding the company's legal compliance before its merger with Trulia, and that Zillow altered the co-marketing program in the midst of the CFPB's investigation, but did not make the changes public. *See supra* Part II.B.3.b.

Viewing these allegations holistically, the Court can infer that Phillips and Rascoff were at least deliberately reckless in continuing to make statements that the co-marketing program was legally compliant. When considering the new allegations contained in the second amended complaint, this inference is cogent and at least as strong as the competing innocent inference that the Court previously found. (*See* Dkt. No. 46 at 29–30.)

### 4.   Loss Causation

"Broadly speaking, loss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (citation omitted). To successfully plead loss causation, a plaintiff must plausibly allege that the decline in the defendant's share price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors. *Metzler*, 540 F.3d at 1062. Put another way, the plaintiff must plausibly allege that the defendant's fraud was "revealed to the market and caused the resulting losses." *Id.* at 1063.

In its prior order, the Court stated that "if Plaintiffs amend their complaint and successfully plead that Defendants made a material misleading statement regarding the co-marketing program's compliance with RESPA, then they could plausibly allege that Zillow's August 2017 statements represented a 'corrective disclosure' that would support loss causation."

(Dkt. No. 46 at 31) (citing *Metzler*, 540 F.3d at 1063–64). Plaintiffs have done just that. The second amended complaint plausibly alleges that Defendants made material misleading statements with the requisite scienter that caused Plaintiffs' losses. This is particularly true of Defendants' statements made in May 2017. Notwithstanding Defendants' objections, the Court finds that the second amended complaint adequately pleads loss causation.

### 5. Control Person Liability

Section 20(a) of the Exchange Act makes certain "controlling" individuals also liable for violations of Section 10(b) and its underlying regulations. *See* 15 U.S.C. § 78t(a). "A defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *No. 84 Emp'r–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (citation and internal quotation marks omitted). "Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b)." *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993).

As noted above, Plaintiffs have plausibly alleged a Section 10(b) violation against Zillow. The second amended complaint contains sufficient allegations regarding Rascoff and Phillips' corporate positions to demonstrate that they exercised actual power or control over Zillow. Therefore, Plaintiffs have plausibly alleged a violation of Section 20(a) against Rascoff and Phillips.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 50) is DENIED.

//

//

//

//

DATED this 19th day of April 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE